Nathan E. Shafroth (Bar No. 232505)
nshafroth@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
*Attorney for Plaintiffs Novo Nordisk A/S and
Novo Nordisk Inc.*

*Additional counsel listed on signature pages*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NOVO NORDISK A/S,<br>NOVO NORDISK INC.<br><br> Plaintiffs,<br><br>v.<br><br>MOCHI HEALTH CORP., MOCHI<br>MEDICAL CA P.C., MOCHI MEDICAL<br>P.A.,<br><br> Defendants. | CASE NO. _____<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

THE PARTIES............................................................................................................... 4

JURISDICTION AND VENUE ..................................................................................... 5

DIVISIONAL ASSIGNMENT....................................................................................... 5

FACTS ENTITLING NOVO NORDISK TO RELIEF .................................................. 5

    A.    Novo Nordisk ............................................................................................ 5

    B.    Novo Nordisk's Semaglutide Products...................................................... 6

    C.    The FDA Drug Approval Process ............................................................. 8

    D.    Compounded Drugs ................................................................................ 10

    E.    Government Warnings of Risks of Compounded Semaglutide............................ 10

    F.    Other Warnings About the Risks of Compounded Semaglutide ........................ 14

    G.    Safety Risks of Unapproved Compounded Drugs ................................................. 16

    H.    Adverse Events Reported After Taking Compounded Semaglutide Drugs.......... 19

    I.    Governing State and Federal Law............................................................ 20

        1.    The Lanham Act .......................................................................... 20

        2.    California False Advertising Law.............................................. 20

        3.    California Unfair Competition Law............................................ 20

        4.    California Law Governing Corporate Practice of Medicine.................... 21

II.    Mochi Violates California Law by Engaging in the Unlicensed Corporate Practice of Medicine .................................................................................................................. 24

    A.    Mochi Health and Mochi Medical Are Controlled by Non-Physicians Who Influence Patient Care.............................................................................. 24

    B.    Mochi Health Sells Its Unapproved Compounded Drugs Through Medical Group Under Its Control .................................................................................... 27

    C.    Mochi Health's Control and Undue Influence over Patient Prescriptions........... 29

    D.    Mochi Health Manipulates Patient Prescriptions Without Good Faith Examination or Medical Indication ................................................................................ 35

III.    Mochi Violates the Lanham Act and California Law by Engaging in False Advertising in Connection With Its Sale of Unapproved Compounded Drugs ........................................ 36

FIRST CAUSE OF ACTION ................................................................ 41

SECOND CAUSE OF ACTION ............................................................ 43

THIRD CAUSE OF ACTION ............................................................... 43

FOURTH CAUSE OF ACTION ........................................................... 45

REQUEST FOR RELIEF ..................................................................... 46

# INTRODUCTION

1.      Plaintiffs Novo Nordisk A/S and Novo Nordisk Inc. (collectively, "Novo Nordisk") bring this Complaint in the interest of public safety and honest competition.

2.      Defendants Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical, P.A. have jeopardized the public health and unfairly competed with Novo Nordisk by violating state and federal law in furtherance of their marketing of mass-produced compounded weight loss drugs.

3.      Defendants' actions have critically undermined the triad of patient care: the pharmacy-patient-prescriber relationship. States have enacted laws and regulations to govern the practice of pharmacy and medicine to ensure that these sectors are free of inappropriate corporate interference and can prioritize patient care and safety above all. States have also established trade laws to protect consumers from unfair and deceptive practices, especially those that could affect their health. Rather than following these laws, Defendants' scheme has chipped away and hollowed out these protections.

4.      Alongside state-level protections for patients, this nation's pharmaceuticals are governed and protected by an approval process that ensures the safety, effectiveness, and quality of medicines before they reach patients. This process gives the American public confidence in the medicines that millions take every day. Companies like Novo Nordisk use this process and diligently follow its myriad of requirements for approval.

5.      Along these lines, Novo Nordisk's innovative molecule, semaglutide, is the active ingredient in three of its blockbuster medicines, marketed under the well-known trade names Ozempic®, Wegovy®, and Rybelsus®. The U.S. Food and Drug Administration ("FDA") reviewed Novo Nordisk's clinical trials and testing before determining that all three of these drugs are safe and effective. Novo Nordisk manufactures the only semaglutide active pharmaceutical ingredient ("API") that has been reviewed by FDA and is included in an FDA-approved medicine.

6.      FDA is clear that patients should receive FDA-approved treatments whenever possible because patients could be injured, hospitalized, or even die from taking compounded drugs such as the drugs marketed by the Defendants that purport to contain semaglutide. Because FDA does not review

the safety, effectiveness, or quality of these drugs before they are marketed, these drugs may be contaminated or contain too much or too little of the key active ingredient.

7.      Given these safety concerns, most states developed laws prohibiting the sale or distribution of unapproved drugs to patients.

8.      Although for patients whose medical needs cannot met by an FDA-approved drug, compounding[1] may be appropriate, FDA has always intended compounding as a narrow exception to its drug approval process.

9.      State and federal law place conditions on compounded drugs for them to qualify for this narrow exception to guard against entities compounding drugs acting as unlicensed, unregulated drug manufacturers selling drugs that could be dangerous to patients.

10.     By exploiting the narrow compounding exception in a way that subverts the drug approval process and undermines patient safety, Defendants have made these dangers a reality.

11.     The shortage of Novo Nordisk's semaglutide injection products ended February 21, 2025, although FDA provided a 90-day window to allow outsourcing facilities to "facilitate an orderly transition" from their compounded drugs to FDA-approved semaglutide medicines.[2]

12.     Recognizing that their ability to compound "copies" of Novo Nordisk's semaglutide medicines would soon close, Defendants claimed to shift their focus to providing "personalized" versions of compounded drug products that purport to contain semaglutide, but that have not been approved by FDA ("Unapproved Compounded Drugs") under a different federal exemption.

13.     Non-physician Mochi Health executives have regularly interfered with, and controlled, physician's prescribing decisions by orchestrating a scheme in which the drugs marketed by Defendants

---

[1] Compounding is a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient. *See* FDA, *Human Drug Compounding* (content current as of May 15, 2025), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding.

[2] Letter from Jacqueline Corrigan-Curay (Acting Director, Center for Drug Evaluation and Research, FDA) to Robert Fischer (Director, Regulatory Affairs, Novo Nordisk Inc.) (Feb. 21, 2025), https://www.fda.gov/media/185526/download.

are in no meaningful way "tailored" to the particular medical needs of any of the tens of thousands of patients to whom Mochi Health has been selling these medicines.

14.     Rather, Mochi Health has fabricated a pre-set selection of dosages created to be just different enough from the FDA-approved doses of semaglutide to carry out this scheme. Moreover, it has continued to offer these Unapproved Compounded Drugs to thousands of different patients without modification. In doing so, Mochi Health directs patients away from safe and effective FDA-approved medications and toward clinically untested, unapproved, and potentially unsafe drugs.

15.     Defendants built their compounded semaglutide business by deceiving patients with false and misleading advertisements, selling an unapproved and misbranded drug under state law, exerting so much inappropriate control over physicians' prescribing practices that Defendants are, in essence, practicing medicine, and leveraging these violations to engage in unfair and deceptive trade practices. Defendants then fraudulently sold hundreds of thousands of Unapproved Compounded Drugs, knowing that these drugs violate state law and could put patients at risk.

16.     Defendants' scheme has flooded the market with unlawfully produced drugs and created a demand for these drugs.

17.     Defendants' actions could lead to devastating consequences. A former FDA commissioner observed that compounding of semaglutide is a "reckless national experiment," and healthcare providers have warned that such compounding is "the largest uncontrolled, unconsented human experiment of our time."[3] The Federal Bureau of Investigation ("FBI") has indicated that "[t]esting of the compounded drugs revealed some of the misrepresented compounds did not contain semaglutide and had large percentages of unknown drug impurities."[4]

18.     It is clear that Defendants do not intend to end their unlawful enterprise. To the contrary, they have doubled-down on pushing as many Unapproved Compounded Drugs to patients as possible.

---

[3] *See* The Obesity Society, *FDA-Approved vs. Compounded GLP-1s: Comparing Safety, Quality, and Transparency*, https://www.youtube.com/watch?v=BJ5DU6u6rZI (Mar. 24, 2025).

[4] *See* FBI, *Safety Concerns Related to Fraudulent Compounding Practices Associated with Weight Loss Drugs* (Feb. 28, 2025), https://www.ic3.gov/PSA/2025/PSA250228.

3

19.     Defendants' scheme threatens to turn the drug approval process into a sham. Left to continue their unlawful activities, Defendants' organization would serve as a blueprint for mass production of compounded versions of medicines even if those drugs are not medically necessary for patients. It will also embolden other business to adopt similar models, in which corporate interests control the practice of medicine and place profits over patient safety.

20.     Novo Nordisk seeks declaratory, injunctive, and monetary relief, including a declaration that Defendants have engaged in unlawful conduct in connection with the manufacture and sale of compounded semaglutide products, an injunction against such conduct, and disgorgement of their illegal profits.

## THE PARTIES

21.     Plaintiff Novo Nordisk A/S ("NNAS") is a corporation organized and existing under the laws of the Kingdom of Denmark and has its principal place of business in Bagsværd, Denmark.

22.     NNAS developed the Ozempic®, Wegovy®, and Rybelsus® medicines and has granted to Novo Nordisk Inc. ("NNI") exclusive rights to market, advertise, promote, offer for sale, and sell those medicines in the United States.

23.     Plaintiff NNI is an indirect, wholly-owned subsidiary of NNAS, organized and existing under the laws of Delaware with a principal place of business in Plainsboro, New Jersey.

24.     NNI promotes, offers, and sells the Ozempic®, Wegovy®, and Rybelsus® medicines throughout the United States, including in this District.

25.     Defendants Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A., (collectively, "Mochi"), are a Delaware corporation, a California professional corporation, and a Florida professional association, respectively, each with a principal place of business at 161 Natoma St., San Francisco, CA 94105. Mochi is a telehealth platform that provides weight loss treatments. Mochi operates and conducts business in California, including by promoting and selling Unapproved Compounded Drugs within the State.

4

## JURISDICTION AND VENUE

26.    The Court has subject matter jurisdiction over the Lanham Act cause of action pleaded herein pursuant to 15 U.S.C. § 1121, and 28 U.S.C. § 1331. Additionally, and in the alternative, the Court has subject matter jurisdiction on diversity grounds pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the matter in controversy exceeds $75,000.

27.    The Court has supplemental jurisdiction over the state causes of action pleaded herein pursuant to 28 U.S.C. § 1367(a), as it is part of the same case or controversy as the federal claim.

28.    Defendants Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A. are subject to personal jurisdiction in California because each has its principal place of business in California.

29.    Defendant Mochi Medical CA, P.C. is further subject to personal jurisdiction in California because it is incorporated in California.

30.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial amount of the harms alleged took place in this District.

## DIVISIONAL ASSIGNMENT

31.    Pursuant to Civil L.R. 3-2(c), this case arises in the County of San Francisco, as a substantial part of the events or omissions giving rise to the claims occurred in the County of San Francisco. For example, Defendant Mochi Health, most notably, lists its principal place of business in the Country of San Francisco.

## FACTS ENTITLING NOVO NORDISK TO RELIEF

### A.    Novo Nordisk

32.    Novo Nordisk is a healthcare company with a 100-year history of innovation in developing medicines to treat serious chronic diseases like diabetes and obesity.

33.    For more than a century, Novo Nordisk has been on the cutting edge of developing life-saving medicines. The company's roots can be traced to the early commercialization of the production of insulin in 1923. Today, Novo Nordisk's medicines provide relief for tens of millions throughout the world.

34.     Like other reputable pharmaceutical manufacturers that produce medicines at scale, Novo Nordisk produces its medicines in accordance with FDA requirements and under strict controls in its state-of-the-art facilities. Novo Nordisk employs thousands of professionals who have the necessary expertise to adhere to these quality and safety standards.

35.     Producing medicines in this way is a complex, science-based, and rigorous process. Novo Nordisk follows Current Good Manufacturing Practices ("cGMP"), the industry standards that help to ensure quality and safety throughout the design, monitoring, and control of its products across manufacturing processes and facilities. Such practices mean that Novo Nordisk, for example, has processes in place to detect and investigate product quality issues and to ensure the quality of its source materials when procuring its products.

36.     In addition, Novo Nordisk is required to comply with all applicable laws under the Federal Food, Drug, and Cosmetic Act ("FDCA") and manufactures its medicines under strict FDA oversight. By doing so, Novo Nordisk offers patients peace of mind that they are using medicines that meet the world's most rigorous quality and safety standards. Novo Nordisk's medicines are subject to exacting pre-approval testing for safety and efficacy under specific conditions for use; its manufacturing facilities are subject to routine FDA inspections; and the company conducts post-market surveillance and studies.

37.     Novo Nordisk's medicines also must be and always are accompanied by labels, instructions, and warnings, which themselves are approved by FDA. Novo Nordisk's medicines are FDA-approved as safe, effective, and of high quality.

**B.      Novo Nordisk's Semaglutide Products**

38.     The development of semaglutide is an example of Novo Nordisk's commitment to innovation for those living with chronic diseases. Semaglutide is the foundational molecule that serves as the primary ingredient for Novo Nordisk's three prescription-only medicines approved by FDA: Wegovy® (semaglutide) injection, Ozempic® (semaglutide) injection, and Rybelsus® (semaglutide) tablets.

39.    The Wegovy® medicine is indicated to reduce excess body weight and maintain weight reduction long-term in adults and children aged 12 years and older with obesity, and adults that are overweight with weight-related medical problems, along with a reduced calorie diet and increased physical activity. Wegovy® is also indicated, with a reduced calorie diet and increased physical activity, to reduce the risk of adverse cardiovascular events such as cardiovascular death, heart attack, or stroke in adults with known heart disease who are either obese or overweight.

40.    The Ozempic® medicine and the Rybelsus® medicine are indicated for adults with type 2 diabetes to improve blood sugar (glucose), along with diet and exercise. The Ozempic® medicine also lowers the risk of cardiovascular events such as stroke, heart attack or death in adults with type 2 diabetes and heart disease and reduces the risk of sustained estimated glomerular filtration rate ("eGFR") decline, end-stage kidney disease, and cardiovascular death in adults with type 2 diabetes and chronic kidney disease.

41.    Each of the Wegovy®, Ozempic®, and Rybelsus® medicines has a unique safety and efficacy profile which is set forth in its respective product label.

42.    The Wegovy®, Ozempic®, and Rybelsus® medicines are prescription-only medicines that should be prescribed only in direct consultation with, and under the supervision of, a licensed healthcare professional.

43.    The Wegovy®, Ozempic®, and Rybelsus® medicines have been extensively studied in clinical trials and are FDA-approved for the treatment of patients with serious chronic diseases.

44.    Novo Nordisk is the only company in the U.S. authorized to sell FDA-approved products containing semaglutide.

45.    FDA has not approved any generic versions of semaglutide medicines. To the contrary, FDA has sent warning letters to companies that have claimed that their unapproved products have the "same active ingredient as Ozempic®, Rybelsus®, and Wegovy®," noting that the Ozempic® and

Wegovy® medicines are the only "two injectable semaglutide products FDA-approved for the U.S. market."[5]

46.    Novo Nordisk does not sell its semaglutide API to Defendants, compounding pharmacies, or outsourcing facilities for the purpose of compounding semaglutide products.

47.    Defendants market and sell to patients what this Complaint refers to as "Unapproved Compounded Drugs," *i.e.*, those produced and sold by the Defendants that they claim contains semaglutide but have not been approved by FDA.

### C.    The FDA Drug Approval Process

48.    FDA's drug approval process serves as the foundation of U.S. drug regulation. FDA's drug review process is recognized as the gold standard worldwide. New drugs in the U.S. must undergo a rigorous evaluation of safety, quality, and effectiveness before they can be sold.

49.    Testing new drugs and obtaining the required regulatory approval to sell them is time-consuming and costly ("[o]n average, it takes 10–15 years and costs $2.6 billion to develop one new medicine"[6]), but drug approval is essential to ensure the quality, safety, and effectiveness of new drugs, and approval is based on evidence.

50.    FDA approval is famously hard to earn. More than 90 percent of drug candidates ultimately fail.[7]

51.    Drug sponsors first subject the drug candidate to preclinical testing to determine if the product is reasonably safe for initial use in humans and if the drug candidate exhibits pharmacological

---

[5] FDA, *Warning Letter to Ozempen.com, MARCS-CMS 684435 — JUNE 24, 2024*, (last updated July 2, 2024) https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/ozempencom-684435-06242024#:~:text=WARNING%20LETTER&text=As%20discussed%20below%2C%20FDA%20has,new%20drugs%20and%20misbranded%20dru.

[6] PhRMA, *Research and Development Policy Framework* (last updated Sept. 2024), https://phrma.org/policy-issues/research-development.

[7] Biotechnology Innovation Organization, *Clinical Development Success Rates and Contributing Factors 2011-2020* at 3 (Feb. 2021), https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf (hereinafter "BIO 2021").

8

activity that justifies commercial development. Based on data derived from preclinical testing, FDA permits the drug sponsor to move the drug candidate into the clinical trial stage, in which it is tested in human subjects through increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials.

52.     Phase I clinical trials typically evaluate the drug candidate's safety and generate data that will inform a range of doses that are safe for use in further clinical testing. This determination typically culls a majority of drug candidates—for example, averaging across diseases, only 52 percent of drug candidates that make it through Phase I testing will progress to Phase II.[8]

53.     Phase II trials are typically designed to establish preliminarily the effectiveness in addition to further confirming safety of the drug for an indication over a range of doses and to develop additional data on its safety. Another swath of drug candidates is eliminated in Phase II: drug candidates progress from Phase II to Phase III at rates between 15 and 48.1 percent depending on disease type.[9] Phase III trials are designed to confirm the safety and effectiveness of a dose identified in Phase II trials in a larger patient population as well as to monitor side effects.

54.     Based on the data assembled during development in Phase I, Phase II, and Phase III clinical trials, a sponsor company can then submit a marketing application to FDA called a New Drug Application, where the sponsor requests that FDA approve the drug candidate for sale and marketing in the United States. The sponsor must identify every ingredient and component in its application to FDA.

55.     Once a drug is approved for manufacture and distribution, FDA conducts inspections to monitor compliance with cGMP and reviews the drug's labeling to ensure appropriate disclosure of side effects, warnings, and contraindications. FDA also requires manufacturers to track and trace each finished product, to promptly report all adverse events, and to conduct further post-approval studies.

---

[8] BIO 2021 at 7.

[9] *Id.*

COMPLAINT

### D.    **Compounded Drugs**

56.    Compounding is historically a practice in which a licensed pharmacist or physician combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient.[10] According to FDA, "compounded drugs are not FDA-approved," and "do not undergo FDA's review for safety, effectiveness and quality before they are marketed."[11]

57.    FDA has warned that "[u]nnecessary use of compounded drugs unnecessarily exposes patients to potentially serious health risks" and that "poor compounding practices can result in serious drug quality problems, such as contamination or a drug that contains too much or too little active ingredient . . . [which] can lead to serious patient injury and death."[12]

58.    Consistent with this warning, FDA recommends that compounded drugs "should only be used for patients whose medical needs cannot be met by an available FDA-approved drug."[13]

### E.    **Government Warnings of Risks of Compounded Semaglutide**

59.    Regulatory agencies in the United States and throughout the world have warned the public that taking unapproved compounded products that claim to contain semaglutide can endanger patients. FDA has publicly warned that compounded glucagon-like peptide-1 ("GLP-1") receptor agonists "can be risky for patients."[14]

---

[10] *See* FDA, Human Drug Compounding, https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding

[11] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated May 30, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss.

[12] FDA, *Compounding and the FDA: Questions and Answers* (last updated Nov. 15, 2024), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

[13] FDA, *FDA alerts health care providers, compounders and patients of dosing errors associated with compounded injectable semaglutide products* (last updated July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded.

[14] *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated May 30, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss.

60.     FDA also released a compounding risk alert to health care providers, compounders, and patients about dosing errors associated with compounded injectable semaglutide products.[15]

61.     FDA has also sent a letter to the Alliance for Pharmacy Compounding, the Federation of State Medical Boards, the National Association of Boards of Pharmacy, the National Council of State Boards of Nursing and the Outsourcing Facility Association highlighting additional factors that contribute to the adverse events associated with compounded drugs claiming to contain semaglutide, including starting patients on incorrect doses, changing the dose administration frequency or titrating on a schedule that deviates from that of Novo Nordisk's FDA-approved semaglutide medicines.[16]

62.     Federal lawmakers have also warned the public about "a surge in illegal and counterfeit anti-obesity medications…which include semaglutide…entering the U.S. from unregistered foreign entities."[17] On July 25, 2025, U.S. Representative Richard Hudson sent FDA Commissioner Marty Makary a letter inquiring about the agency's efforts to curb the spread of these Unapproved Compounded Drugs, noting that such products "may contain dangerously high concentrations of active ingredients, unknown compounds, or contaminants."[18] Therefore, "these substances pose a significant threat to consumer health, including the potential for adverse reactions, toxic exposure, or overdose."[19] Congressman Hudson's letter was signed by a bipartisan group of 80 members of the U.S. Congress.

---

[15] FDA, *FDA alerts health care providers, compounders and patients of dosing errors associated with compounded injectable semaglutide products* (last updated July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded.

[16] Letter from Shannon Glueck, Branch Chief, Compounding Branch 4, U.S. Food and Drug Administration to Philip Dickison, Chief Executive Officer, National Council of State Boards of Nursing (Jul. 16, 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/department-and-offices/bpoa/nursing/fda-safety-alert.pdf.

[17] U.S. Representative Richard Hudson, *Letter to FDA Commissioner Marty Makary on Illegal and Counterfiet Anti-Obesity Medications*, (July 25, 2025) https://x.com/RepRichHudson/status/1948775451960193226/photo/1.

[18] *Id.*

[19] *Id.*

63.    The FBI has also issued a public service announcement warning about the risks of compounded products claiming to contain semaglutide. The FBI indicated that "[t]esting of the compounded drugs revealed some of the misrepresented compounds did not contain semaglutide and had large percentages of unknown drug impurities."[20] The FBI highlighted that providers are using compounded mixtures of unknown drugs that "do not contain semaglutide, drugs with high levels of impurities, and unsafe or unapproved drugs."[21] One southern-based medical spa and weight loss clinic reportedly offered and sold their own compounded "semaglutide" product, which used "'animal grade' semaglutide with vitamin B12."[22]

64.    At least 18 state boards of pharmacy, boards of medicine, and other state professional regulators have alerted licensees in their states about compounded products that claim to contain semaglutide.[23] For instance, the Alabama Board of Medical Examiners has cautioned that semaglutide

---

[20] *See* FBI, *Safety Concerns Related to Fraudulent Compounding Practices Associated with Weight Loss Drugs* (Feb. 28, 2025), https://www.ic3.gov/PSA/2025/PSA250228.

[21] *Id.*

[22] *Id.*

[23] *See, e.g.*, Ala. Bd. Pharmacy, Compounding Semaglutide (Nov. 2023); Ala. State Bd. of Medical Examiners, Declaratory Ruling of the Alabama State Board of Medical Examiners (Aug. 8, 2024); Health Professions Bureau of the Idaho Div. of Occupational and Prof'l. Licenses, Clinic Dispensing of GLP-1 Products (May 24, 2024); Ill. Dep't. of Fin. and Prof'l. Regul., Consumer Alert: Compounded Weight Loss Drugs (Summer 2024); Kan. Bd. Pharmacy, Statement on Compounding and Dispensing of Compounded Semaglutide and Other GLP-1 Receptor Agonists (Apr. 16, 2025); Ky. Bd. Pharmacy, Semaglutide Compounding Guidance (2025); Meg Farris, Low-cost weight loss drug banned in La., 4WWL (Apr. 27, 2023) (reflecting ban by Louisiana Board of Pharmacy); Minn. Bd. Pharmacy, Semaglutide and GLP-1 Drugs (Jul. 2024); Miss. Bd. Pharmacy, Compounded Products Due to Shortage or Due to Special Patient Needs; Miss. State Bd. of Medical Licensure, Guidance Regarding Semaglutide-Based Medications From the Mississippi State Board of Medical Licensure (Aug. 29, 2023); N.C. Bd. Pharmacy, Statement Concerning Semaglutide Compounding (Apr. 2023); N.J. Bd. Pharmacy, Statement Concerning Semaglutide Compounding (Nov. 6, 2023); Ohio Bd. Pharmacy, FDA Alerts Health Care Providers, Compounders, and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products (Aug. 2024); Or. Bd. Pharmacy, Statement on Semaglutide (Feb. 6, 2025); S.D. Bd. Pharmacy, Beware of Fraud and Counterfeit Popular Weight Loss Products (Jan. 2024); Utah Bd. Pharmacy, Compounded Semaglutide – Cautions and Concerns (May 2024); Wash. State Department of Health, Statement on Compounding Semaglutide (Aug. 22, 2024); W. Va. Bd. Pharmacy, Statement Concerning Semaglutide Compounding (Apr. 2023).

12

products other than those manufactured by Novo Nordisk "may be contaminated, improperly stored and transported, or adulterated."[24]

65.    On February 19, 2025, a coalition of 38 state attorneys general urged FDA to take decisive action against "bad actors unlawfully profiting off the high demand for FDA-approved weight loss and diabetes drugs."[25] The letter sent by the Attorneys General encouraged FDA to "ramp up enforcement against any compounding pharmacies" due to the serious adverse events associated with contaminated drug products produced by compounding pharmacies under insanitary conditions.[26]

66.    Six state attorneys general also released separate alerts warning patients in their states about compounded drugs claiming to contain semaglutide.[27] For example, the Illinois Attorney General alerted consumers that sellers advertising "name brand medications [such as Ozempic® and Wegovy®] are instead offering unapproved versions of these products that may put people's health at risk."[28] The attorney general further warned consumers about misleading advertising that claims to offer name brand

---

[24] Ala. Bd. Med. Exam'rs & Med. Licensure Comm'n, *Concerns with Semaglutide and Other GLP-1 Receptor Agonists*, https://www.albme.gov/press-release/concerns-with-semaglutide-and-other-glp-1-receptor-agonists.

[25] Letter from The National Association of Attorneys General to Acting Commissioner Sara Brenner, U.S. Food and Drug Administration (Feb. 19, 2025), https://www.naag.org/wp-content/uploads/2025/02/FDA-GLP-1-Ltrhead-e.pdf.

[26] *Id.*

[27] Office of the Illinois Attorney General Kwame Raoul, Attorney General Raoul Reminds Illinois Residents to be Vigilant When Seeking GLP-1 Drugs for Weight Loss (updated Jan. 3, 2025); Office of South Carolina Attorney General Alan Wilson, CONSUMER ALERT: Attorney General Alan Wilson warns consumers to be cautious when purchasing unapproved and compounded weight loss medications (Jan. 3, 2025); Office of Ohio Attorney General Dave Yost, AG Yost Warns Med Spas: Stop Misleading Consumers About Weight-Loss Drugs (Apr. 16, 2025); Office of Tennessee Attorney General Jonathan Skrmetti, Tennessee Attorney General's Consumer Protection Division Warns Consumers of Counterfeit Weight Loss Drugs (Mar. 20, 2025); Office of Mississippi Attorney General Lynn Fitch, AG Fitch Warns Mississippians of Unapproved and Compounded Weight Loss Medication (May 6, 2025); Office of the Connecticut Attorney General William Tong, Attorney General Tong Sues GLP-1 Weight Loss Drug Distributor Triggered Brand, Announces Investigation Into Sale of Untested, Unsafe "Research-Grade" Drugs to Connecticut Consumers (May 21, 2025).

[28] Office of the Illinois Attorney General Kwame Raoul, *Attorney General Raoul Reminds Illinois Residents to be Vigilant When Seeking GLP-1 Drugs for Weight Loss* (last updated Jan. 3, 2025), https://www.illinoisattorneygeneral.gov/news/story/updated-consumer-alertattorney-general-raoul-reminds-illinois-residents-to-be-vigilant-when-seeking-glp-1-drugs-for-weight-loss.

13

GLP-1 medications when the seller is actually selling compounded drugs, which the attorney general affirms "are not the same as generic drugs."[29]

### F.  Other Warnings About the Risks of Compounded Semaglutide

67.     Patient and provider groups have also spoken out about the risks associated with compounded products claiming to contain semaglutide.[30] On December 2, 2024, the American Diabetes Association ("ADA") released a statement on compounded GLP-1 and dual glucose-dependent insulinotropic polypeptide ("GIP") and GLP-1 receptor agonists. The ADA "recommends against using non-FDA-approved compounded GLP-1 and dual GIP/GLP-1 RA products due to safety, quality, and effectiveness concerns and uncertainty about their content."[31]

68.     International regulators too have recognized the serious risks associated with compounded drugs claiming to contain semaglutide.

69.     In early 2025, Health Canada issued a recall notice for compounded "semaglutide" and pyridoxine drugs from an Alberta-based compounding pharmacy, highlighting that the products were

---

[29] *Id.*

[30] *See, e.g.*, The Obesity Society, Obesity Action Coalition, & Obesity Medicine Association, *Leading Obesity Expert Organizations Release Statement to Patients on Compounded GLP-1 Alternatives* (Jan. 8, 2024); Endocrine Society, *Webinar will examine concerns around compounding anti-obesity medications* (Nov. 6, 2024); National Academies of the Sciences, Engineering, and Medicine, *New Weight Loss Drugs (GLP-1s) Explained: Science, Impact, Potential* (Nov. 21, 2024); Pediatric Endocrine Society, *Statement on use of compounded semaglutide and other GLP-1 receptor agonists* (Jan. 16, 2024); Joshua J. Neumiller et al., *Compounded GLP-1 and Dual GIP/GLP-1 Receptor Agonists: A Statement from the American Diabetes Association*, 48 DIABETES CARE 177—181 (Feb. 2025); Letter from Aimed Alliance, Alliance for Women's Health & Prevention, Association of Black Cardiologists, Bone Health & Osteoporosis Foundation, Chronic Care Policy Alliance, Color of Gastrointestinal Illnesses, Diabetes Patient Advocacy Coalition, Global Liver Institute, HealthyWomen, Mended Hearts, Minority Health Institute, National Alliance for Caregiving, National Black Nurses Association, National Consumer League, National Hispanic Health Foundation, National Hispanic Medical Association, Obesity Action Coalition, The Obesity Society, WomenHeart, Lyn Behnke, Lisa Larkin, and Spencer Nadolsky to Acting Commissioner Sara Brenner, U.S. Food and Drug Administration (Mar. 20, 2025).

[31] Joshua J. Neumiller et al., *Compounded GLP-1 and Dual GIP/GLP-1 Receptor Agonists: A Statement from the American Diabetes Association*, 48 DIABETES CARE 177—181 (Feb. 2025), https://diabetesjournals.org/care/article/48/2/177/157478/Compounded-GLP-1-and-Dual-GIP-GLP-1-Receptor.

"produced with an unauthorized active pharmaceutical ingredient."[32] On March 5, 2025, the South African Health Products Regulatory Authority ("SAHPRA") announced its intent to declare compounded drugs containing GLP-1 agonists "undesirable," and therefore unable to be sold, under South Africa's Medicines and Related Substances Act.[33] According to the Act, SAHPRA may declare a medicine "undesirable" if it is not in the public interest that such medicine is made available to the public.[34] SAHPRA concluded that compounded products using GLP-1 agonist active ingredients are not in the public interest because of the inherent variability, lack of regulatory oversight, and potential safety risks associated with such practices.[35]

70.    Furthermore, the Brazilian Health Regulatory Agency ("ANVISA") concluded that the safety and efficacy profile of the synthetic semaglutide being used in compounding may be different from semaglutide manufactured using recombinant DNA technology and that these differences could result in impurities with a higher degree of toxicity, which could decrease the safety of the final product.[36] ANVISA has also stated that, regardless of its source, semaglutide presents technical challenges that compounding pharmacies are often not equipped to overcome.[37]

---

[32] Health Canada, *Health Product Recall: Semaglutide + Pyridoxine: produced with an unauthorized active pharmaceutical ingredient* (last updated Jan. 21, 2025), https://recalls-rappels.canada.ca/en/alert-recall/semaglutide-pyridoxine-produced-unauthorized-active-pharmaceutical-ingredient.

[33] South African Health Products Regulatory Authority, *Communication to Stakeholders: INTENTION TO DECLARE MEDICINES COMPOUNDED IN TERMS OF SECTION 14(4) CONTAINING GLP-1 OR GLP-1/GIP AGONISTS UNDESIRABLE IN TERMS OF SECTION 23 OF THE MEDICINES AND RELATED SUBSTANCES ACT, ACT 101 OF 1965, AS AMENDED* (Mar. 5, 2025), https://www.sahpra.org.za/wp-content/uploads/2025/03/Comms-to-Industry-RC03-Intention-to-Declare-Medicines-Compounded.pdf.

[34] *Id.*

[35] *Id.*

[36] *See* Agencia Nacional de Vigilancia Sanitaria (ANVISA), Nota Técnica No. 74/2024/SEI/COINS/GGFIS/DIRE4/ANVISA (Sept. 18, 2024); ANVISA, Nota Técnica No. 92/2024/SEI/COINS/GIMED/GGFIS/DIRE4/ANVISA (Nov. 13, 2024).

[37] ANVISA, Nota Técnica No. 115/2025/SEI/GIMED/GGFIS/DIR4/ANVISA (Mar. 21, 2025).

71.    The Australian government took the largest step to protect patients and banned compounding pharmacies in Australia from making GLP-1s like semaglutide based on safety concerns.[38]

### G.    Safety Risks of Unapproved Compounded Drugs

72.    The danger of compounded semaglutide is not merely theoretical, as the manufacture and distribution of improperly formulated compounded drugs have endangered and harmed public health. There is a long history of illnesses and deaths associated with erroneously compounded drugs distributed to patients, including in California.[39]

73.    One of the most significant outbreaks was the New England Compounding Center crisis. In 2012, nearly 800 patients in 20 states were diagnosed with a fungal meningitis infection after receiving injections of an unapproved preservative-free methylprednisolone acetate drug manufactured in Massachusetts.[40] At least one hundred people died as a result of the outbreak.[41] As FDA has stated, the outbreak "was the most serious in a long history of serious adverse events associated with contaminated, super-potent, mislabeled, or otherwise poor quality compounded drugs," and "many serious adverse events linked to poor quality compounded drugs, including outbreaks of infections and deaths have occurred since then."[42]

---

[38] Therapeutic Goods Act 1990 (effective date Oct. 1, 2024), https://www.legislation.gov.au/F1996B00406/latest/text; Ministers Department of Health and Aged Care, *Protecting Australians from Unsafe Compounding of Replica Weight Loss Products* (May 22, 2024), https://www.health.gov.au/ministers/the-hon-mark-butler-mp/media/protecting-australians-from-unsafe-compounding-of-replica-weight-loss-products?language=en.

[39] Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated with Compounded or Repackaged Medications 2001-19* (Mar. 2, 2020), https://www.pew.org/en/research-and-analysis/data-visualizations/2020/us-illnesses-and-deaths-associated-with-compounded-or-repackaged-medications-2001-19.

[40] DOJ, *Two Former New England Compounding Center Pharmacist Sentenced* (May 30, 2019), https://www.justice.gov/usao-ma/pr/two-former-new-england-compounding-center-pharmacists-sentenced.

[41] *Id.*

[42] FDA, *FDA's Human Drug Compounding Progress Report* (Jan. 2017), https://www.fda.gov/media/102493/download.

74.     Additionally, there have been notable public health incidents involving compounded drugs affecting California patients or originating from California compounding pharmacies. One significant example occurred in 2017, where a compounding pharmacy in Irvine compounded curcumin (a component of the spice turmeric) emulsion products for injection that contained polyethylene glycol ("PEG") 40 castor oil, which is typically used industrially or for research but is not suitable to treat humans.[43] One patient who received this product suffered from a heart attack, lost oxygen to the brain, and died.[44] In 2014, a California clinic injected a patient with an unknown compounded mixture to treat chronic musculoskeletal pain; the patient later learned that she had contracted Hepatitis C virus when she attempted to donate blood.[45] A subsequent investigation by local public health agencies and the U.S. Centers for Disease Control and Prevention discovered that the patient and six others contracted Hepatitis C virus after receiving injections at the same California clinic. The investigation uncovered poor infection control practices at the clinic, including reentering a multidose vial with a used syringe, using a single-dose vial for multiple patients, poor hand hygiene, and inconsistent glove use.[46]

75.     Because of the risk inherent in compounded drugs, FDA has issued several other "compounding risk alerts to inform health care professionals and compounders about risks associated with compounded drugs, including information on adverse events, outbreaks and issues with product

---

[43] *See* FDA, *FDA investigates two serious adverse events associated with ImprimisRx's compounded curcumin emulsion product for injection* (Aug. 4, 2017), https://www.fda.gov/drugs/human-drug-compounding/fda-investigates-two-serious-adverse-events-associated-imprimisrxs-compounded-curcumin-emulsion; Janet Woodcock and Julie Dohm, *Toward Better-Quality Compounded Drugs — An Update from the FDA*, 377 New England J. of Med. 2509 (Dec. 2017), https://www.nejm.org/doi/full/10.1056/NEJMp1712905.

[44] *Id.*

[45] Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001-19*, (Mar. 2, 2020) https://www.pew.org/en/research-and-analysis/data-visualizations/2020/us-illnesses-and-deaths-associated-with-compounded-or-repackaged-medications-2001-19.

[46] *See* Monique A. Foster et al., *Notes from the Field: Investigation of Hepatitis C Virus Transmission Associated with Injection Therapy for Chronic Pain — California, 2015*, 65 CDC Morbidity and Mortality Weekly Report 547 (Jun. 2016).

17

quality."[47] These alerts have warned about compounded drugs that did not contain the active ingredient listed on the label of the product[48] and the variability in dosages of the active ingredients in compounded drug products intended for oral and sublingual administration.[49] FDA has stated that these issues make it "challenging to predict which potential risks may be associated with these products," and place patients "at risk for serious adverse events, misuse, and abuse."[50]

76.    FDA and California regulatory authorities have also worked together to protect patients from quality issues related to compounded semaglutide products.

77.    On April 6, 2022, the California Board of Pharmacy notified the public that an out-of-state compounding pharmacy was expanding its recall of products due to a lack of assurance of sterility.[51] This recall included batches of compounded semaglutide products. The compounding pharmacy ultimately recalled over 15,000 vials of compounded semaglutide across the country.[52]

78.    On August 14, 2024, FDA received a complaint from a patient who noticed a black particulate in a vial of semaglutide compounded by a pharmacy in Ontario, California.[53] FDA and

---

[47] FDA, *Compounding Risk Alerts* (last updated Apr. 22, 2025), https://www.fda.gov/drugs/human-drug-compounding/compounding-risk-alerts.

[48] FDA, *FDA investigates two adverse events associated with United Pharmacy's compounded glutamine, arginine, and carnitine product for injection* (last updated June 21, 2018), https://www.fda.gov/drugs/human-drug-compounding/fda-investigates-two-adverse-events-associated-united-pharmacys-compounded-glutamine-arginine-and.

[49] FDA, *FDA warns patients and health care providers about potential risks associated with compounded ketamine products, including oral formulations, for the treatment of psychiatric disorders* (last updated Oct. 10, 2023), https://www.fda.gov/drugs/human-drug-compounding/fda-warns-patients-and-health-care-providers-about-potential-risks-associated-compounded-ketamine.

[50] *Id.*

[51] California Board of Pharmacy, Recall Alert: Tailor Made Compounding (Apr. 4, 2022), https://www.pharmacy.ca.gov/about/recall_alerts/040622_taylor.pdf.

[52] *See* FDA Enforcement Report, Event ID 89909 (2022), https://www.accessdata.fda.gov/scripts/ires/index.cfm?Event=89909.

[53] *See* FDA, ☐ *FDA warns patients and health care professionals not to use compounded drugs from Fullerton Wellness,* (last updated Nov. 1, 2024) https://www.fda.gov/drugs/drug-safety-and-availability/fda-warns-patients-and-health-care-professionals-not-use-compounded-drugs-fullerton-wellness.

California regulatory authorities inspected the facility a month later and discovered conditions that could cause the compounded drugs to become contaminated.[54]

**H.    Adverse Events Reported After Taking Compounded Semaglutide Drugs**

79.    FDA has reported that it has "received multiple reports of adverse events, some requiring hospitalization, that may be related to" compounded drugs purporting to contain semaglutide and has reminded patients and health care professionals that the "agency does not review compounded versions of these drugs for safety, effectiveness, or quality."[55]

80.    According to FDA's Adverse Event Reporting System, as of March 31, 2025, there had been 767 cases of adverse events associated with compounded products that purport to contain semaglutide.[56] This figure is triple the number of adverse events for *all* compounded drugs in fiscal year 2022.[57] FDA has classified approximately 75 percent of those cases as "serious" adverse events; approximately 25 percent of those cases have resulted in hospitalization; and 14 of those cases involved patient deaths.[58]

81.    Such adverse events are likely underreported.[59] These adverse events are underreported because unlike manufacturers of FDA-approved medicines, federal law does not require state-licensed

---

[54] *Id.*

[55] FDA, *Medications Containing Semaglutide Marketed for Type 2 Diabetes or Weight Loss* (last updated Jan. 10, 2024), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss.

56 FDA, FAERS Public Dashboard, https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (search for all drug products including "semaglutide" and filter by "Compounded Drug" tag).

[57] FDA, *Mitigating Risks of Compounded Drugs Through Surveillance* (current as of Sept. 20, 2023), https://www.fda.gov/drugs/human-drug-compounding/mitigating-risks-compounded-drugs-through-surveillance.

58 FDA, FAERS Public Dashboard, https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (search for all drug products including "semaglutide" and filter by "Compounded Drug" tag).

[59] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated Dec. 18, 2024), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss.

pharmacies to report adverse events to FDA[60] and outsourcing facilities report only adverse events that they classify as serious and unexpected.[61]

## I.    Governing State and Federal Law

### 1.    The Lanham Act

82.    The Lanham Act protects consumers and competitors from deception and unfair competition in the marketplace. It does so in part by prohibiting false and misleading statements of fact in commercial advertising and promotion. Statements that misrepresent the nature, characteristics, or qualities of a business's goods, services, or commercial activities are actionable under Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B).

### 2.    California False Advertising Law

83.    California's False Advertising Law makes it unlawful for any person or entity to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

### 3.    California Unfair Competition Law

84.    California's Unfair Competition Law prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

85.    The "unlawful" prong of California's Unfair Competition Law establishes a cause of action for unfair competition based on violations of other state laws.

86.    The "fraudulent" prong of California's Unfair Competition Law establishes a cause of action for false or misleading statements of fact in commercial advertising or promotion.

---

[60] *Id.*

[61] *See* FDA, *Guidance for Industry: Adverse Event Reporting for Outsourcing Facilities Under Section 503B of the Federal Food, Drug, and Cosmetic Act* (Oct. 2015), https://www.fda.gov/media/90997/download.

### 4.    California Law Governing Corporate Practice of Medicine

87.    California, like a majority of states, prohibits corporations from practicing medicine[62]—a legal bar known as the corporate practice of medicine doctrine.

88.    This longstanding doctrine bans corporations not only from directly practicing medicine, as its name implies, but also from employing physicians to provide professional medical services or controlling or influencing the practice of medicine.

89.    The public policy concerns animating the corporate practice of medicine doctrine are stark: there exists a clear tension between a corporation's obligation to its shareholders to maximize profits and a physician's duty to provide quality care to patients. This tension, if not mitigated with appropriate controls, would inevitably compromise a physician's independent medical judgment, risking harm to patient health.

90.    Under California's corporate practice of medicine doctrine, "a corporation may not engage in the practice of medicine, either directly or indirectly, by contracting with physicians or other health care professionals to provide health care services."[63] At its core, this law is intended to prevent unlicensed persons from interfering with, or influencing, the physician's professional judgment."[64]

91.    The Medical Board of California ("Board") has made clear that violation of the state's corporate practice of medicine law does not necessarily depend on existence of a formal employment relationship, noting that a corporation may engage in unlawful corporate practice of medicine "even if physicians operate as independent contractors and not as employees of [the] corporation."[65]

---

[62] *See* Cal. Bus. & Prof. Code §§ 2052 (criminalizing the practice of medicine without a license), 2032 (permitting only natural persons to be licensed to practice medicine in California), 2400 (providing that "[c]orporations and other artificial entities . . . have no professional rights, privileges, or powers" in the practice of medicine in California).

[63] Medical Board of California, Enforcement Actions Re Unlicensed Practice of Medicine (May 5, 2011) ("MBC CPOM Enforcement Guidance").

[64] *See* Medical Board of California, Information Pertaining to the Practice of Medicine: Corporate Practice of Medicine, https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/ ("MBC CPOM Guidance").

[65] MBC CPOM Enforcement Guidance.

92.    Rather, the relevant inquiry turns on the extent of influence exerted by a corporation over physicians. As the Board has explained, a corporation violates California law "when it exercises control over decisions made by" physicians.[66]

93.    The Board has outlined the kinds of decisions that must remain strictly within the purview of licensed physicians:

- Identifying diagnostic tests appropriate for a condition;

- Determining the need for referrals to or consultation with another physician;

- Taking responsibility for the ultimate overall care of the patient (*including treatment options*); and

- Deciding the number of patients a physician sees in a given period of time or how many hours a physician works.[67]

94.    Corporations engaging in any such activities run afoul of California's prohibition on the corporate practice of medicine.

95.    California corporate practice of medicine law "encompass[es] not only direct medical decisions, but 'business' and 'administrative' decisions which have medical implications as well."[68] To this end, the Board has stated that "business" or "management" decisions and activities that amount to control over a physician's practice of medicine and that, if exercised by a corporation, would raise "red flags" indicating the corporate practice of medicine. These responsibilities include, *inter alia*, owning a patient's medical records and selecting, hiring, and firing physicians.[69]

96.    California law governing telehealth likewise makes clear that a corporation cannot be involved in clinical decisions regarding prescriptions—including a prescription drug's formulation, dosage, or titration schedule. Rather, such prescribing decisions must be made by a physician pursuant

---

[66] MBC CPOM Enforcement Guidance.

[67] *See* MBC CPOM Guidance (emphasis added).

[68] MBC CPOM Enforcement Guidance.

[69] *See* MBC CPOM Guidance.

22

to a good faith assessment of the patient, which should identify the clinical need for the drug prescribed.[70]

97.     Due to California's corporate practice of medicine doctrine, telehealth companies owned and operated by non-physicians are prohibited from providing medical care to patients or employing physicians to provide such care.

98.     To comply with this restriction, telehealth companies often rely on an exception to the corporate practice of medicine granted by law to physicians—known as a "professional corporation" ("PC") or sometimes in other states, a "professional association" ("PA"). Subject to limited exceptions, non-physicians cannot own shares in or exercise control over a PC.[71] To protect physician autonomy, California prohibits shareholders of a PC from entering into a voting "arrangement vesting another person (other than another person who is a shareholder of the same [PC]) with the authority to exercise the voting power of any or all of the shareholder's shares."[72]

99.     Although a corporate telehealth company may contract with one or more PCs—either directly or through a management services organization—this partnership cannot stray beyond limited administrative support. The Board has recognized that partnerships between corporations and PCs would violate California law to the extent that they involve a "non-physician exercising controls over a physician's medical practice, even where physicians own and operate the business," as opposed to the corporation "only providing administrative staff and services for a physician's medical practice."[73]

---

[70] *See* California Business & Professions Code § 2242(a) (providing that "[p]rescribing, dispensing, or furnishing dangerous drugs . . . without an appropriate prior examination and a medical indication" constitutes "unprofessional conduct"); § 4022(a) (defining "dangerous drug" as a prescription drug, i.e., "[a]ny drug that bears the legend: 'Caution: federal law prohibits dispensing without prescription,' 'Rx only,' or words of similar import").

[71] *See* Cal. Corp. Code §§ 13405(a) (permitting a PC to "lawfully render professional services in this state, but only through employees who are licensed persons"), 13406(a) ("[S]hares of capital stock in a professional corporation may be issued only to a licensed person or to a person who is licensed to render the same professional services in the jurisdiction or jurisdictions in which the person practices, and any shares issued in violation of this restriction shall be void.").

[72] Cal. Corp. Code § 13406(a).

[73] *See* MBC CPOM Guidance.

## II.    Mochi Violates California Law by Engaging in the Unlicensed Corporate Practice of Medicine

100.    Mochi violates California's prohibition on the corporate practice of medicine in multiple ways. First, Mochi Health's affiliated medical group is under the direct control and influence of non-physicians. Second, Mochi Health hires and employes physicians, controls physician prescribing guidelines, and controls patient medical records. Third, Mochi Health changes patient prescriptions *en masse* by changing the dosages and formulations of its Unapproved Compounded Drugs. Fourth, Mochi Health changes patient prescriptions without any consultation from a health care provider or any indication that such changes are medically necessary.

### A.    Mochi Health and Mochi Medical Are Controlled by Non-Physicians Who Influence Patient Care

101.    Mochi Health is a telehealth corporation that purports to match patients with physicians to provide them with medical services. One such service is weight loss and weight management. These same physicians prescribe Defendants' Unapproved Compounded Drugs.

102.    Myra Ahmad is Mochi Health's Co-Founder and Chief Executive Officer. Upon information and belief, Ms. Ahmad is married to Abraham Chaibi.[74] Mr. is also an owner of Mochi Health.

103.    Ms. Ahmad publicly characterizes herself as a physician.[75] She has done so in interviews, including video interviews on online channels with more than 23,000 subscribers.[76] In the same interview, Ms. Ahmad does not correct the interviewer when she mischaracterizes her as "Dr. Myra."[77]

---

[74] Khaos Entertainment, *Myra Ahmad & Abrahim Chaibi Married December 21, 2019 at The Banff Springs Hotel. A magical multicultural wedding after a massive snowfall!!*, FACEBOOK (Dec. 22, 2019) https://www.facebook.com/watch/?v=668895403645110.

[75] DOWNSIZED, *Exclusive Interview Dr Myra – The CEO & Founder of Mochi Health Speaks Out!*, YOUTUBE (Feb. 28, 2025) https://youtu.be/XknghozB0mc?si=42iJvkHo8bRAu09Z&t=56.

[76] *Id.*

[77] *Id.*

104.    In truth, Ms. Ahmad is not a licensed physician in any state, including California. The same is true of her husband, Mr. Chaibi. By falsely claiming that she is a doctor, Ms. Ahmad has violated Cal. Bus. & Prof. Code §§ 2052 and 2054.[78]

105.    Their lack of proper licensure has not stopped Ms. Ahmad and Mr. Chaibi from directly and indirectly controlling and exerting undue influence on prescribing decisions for Mochi Health patients.

106.    Indeed, through Mochi Health, Ms. Ahmad and Mr. Chaibi exert undue control and include over each of the Defendants and affiliated entities, with at least one of three family members (Ms. Ahmad, Mr. Chaibi, and Rana Ahmad) listed in past or present corporate filings of each Defendant and affiliated entities as well.

107.    For example, Mochi Health's Washington state registration lists Ms. Ahmad and Mr. Chaibi as "governors" and Rana Ahmad as its registered agent.[79] Upon information and belief, Rana Ahmad is Ms. Ahmad's father.

---

[78] Cal. Bus. & Prof. Code §§ 2052 and 2054 ("any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense"); ("Any person who uses in any sign, business card, or letterhead, or, in an advertisement, the words 'doctor' or 'physician,' the letters or prefix 'Dr.,' the initials 'M.D.,' or any other terms or letters indicating or implying that he or she is a physician and surgeon, physician, surgeon, or practitioner under the terms of this or any other law, or that he or she is entitled to practice hereunder, or who represents or holds himself or herself out as a physician and surgeon, physician, surgeon, or practitioner under the terms of this or any other law, without having at the time of so doing a valid, unrevoked, and unsuspended certificate as a physician and surgeon under this chapter, is guilty of a misdemeanor."). Upon information and belief, Ms. Ahmad does not fall within any applicable exceptions to this section.

[79] Washington Sec'y of State, *Annual Report of Mochi Health Corp.* (2025).

108.    Upon information and belief, Mochi Health is funded by Dexterity Capital, an investment fund partially owned by Mr. Chaibi.[80]

109.    Likewise, Rana Ahmad is the director of Mochi Medical, which represents Mochi Health's "affiliated medical services providers."[81] Mochi Medical, P.A.'s corporate registration forms have previously identified Ms. Ahmad as its Director and CEO, under penalty of perjury.[82] On the same registration form, Ms. Ahmad once again is incorrectly and impermissibly referred to as "Dr. Myra Ahmad."[83]

110.    Mochi Health[84], Mochi Medical[85], P.A., and Mochi Medical CA, P.C.[86] all share an address at 161 Natoma Street, San Francisco, CA 94105.

111.    Rana Ahmad has registered Mochi Medical, P.A. with his Mochi Health email address.[87]

112.    Defendants work together to attract patients interested in Novo Nordisk's FDA-approved and efficacious medicines by advertising these drugs on Mochi Health's website and then

---

[80] The Founder Story, *Myrah Ahmad, Co-Founder of Mochi Health Talks About Building A Telehealth Company,* SPOTIFY (Jul. 27, 2022), https://open.spotify.com/episode/3q3PlAApJPmHTL8IOHQfk6 at 2:55; *see also Decential, 'Kind of free money' in the 2017 Crypto Mayhem Set Dexterity Capital on Path to High-Speed Trading* (Mar. 8, 2022), https://www.decential.io/articles/kind-of-free-money-in-the-2017-crypto-mayhem-set-dexterity-capital-on-path-to-high-speed-trading.

[81] Mochi Health, *Mochi - Terms of Use*, (Sep. 10, 2024), https://app.joinmochi.com/terms.

[82] Florida Sec'y of State, *Florida Profit Corporation Annual Report* (2023), https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p22000044605-2bfd1531-811d-42e0-b969-46b697f7426f&transactionId=p22000044605-7cedff0c-106d-4291-9946-53689adfd671&formatType=PDF.

[83] *Id.*

[84] Washington Sec'y of State, *Annual Report of Mochi Health Corp.* (2025).

[85] Florida Sec'y of State, *Florida Profit Corporation Annual Report* (2024), https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p22000044605-2bfd1531-811d-42e0-b969-46b697f7426f&transactionId=p22000044605-77e201fc-e0ba-4717-82b4-76960a0f22d8&formatType=PDF.

[86] California Sec'y of State, *Statement of Information for Mochi Medical CA, P.C.* (Filed Mar. 22, 2024).

[87] Vermont Sec'y of State, *Annual Report of Mochi Medical, P.A.* (2025).

26

overwhelmingly redirecting them towards Mochi Health's Unapproved Compounded Drugs. Defendants do so to line their pockets, all at the expense of patient safety.

**B.    Mochi Health Sells Its Unapproved Compounded Drugs Through Medical Groups Under Its Control**

113.    Mochi Health makes no attempt to portray Mochi Medical's physicians as independent of Mochi Health's control; on Mochi Health's website, it proudly claims these physicians as "Our Mochi doctors."[88] Similarly, Mochi Health's website lists a number of physicians and refers to them as "[o]ur network of board-certified obesity medicine providers and registered dieticians."[89]



114.    Mochi Health—*not* Mochi Medical Groups or its affiliates—actively recruits physicians to be under its employ.[90] This job posting is also instructive as it demonstrates that physicians are not being hired to exercise their discretion as health care providers. Instead, Mochi Health makes clear that

---

[88] Mochi Health, *Medications*, https://joinmochi.com/medications (last visited July 26, 2025).

[89] Mochi Health, https://joinmochi.com/ (last visited July 26, 2025).

[90] Mochi Health Job Postings, *Physician – Obesity Medicine*, https://job-boards.greenhouse.io/mochihealth/jobs/4535832008 (last visited July 26, 2025).

physicians are being hired to "[p]rescribe and manage GLP-1 medications and other obesity treatments."[91]



115.    Again, these job postings are listed as openings at Mochi Health and *not* Mochi Medical. Mochi Health makes no attempt to distinguish between roles at Mochi Health and Mochi Medical on its "Careers" page, nor could it do so, since Mochi Health and Mochi Medical are one and the same.

116.    Similarly, upon information and belief, Mochi Health provides its physicians with diagnostic tools and trains them to use these protocols. Mochi Health also owns and controls patient records through what it describes as its "custom-built" electronic medical record ("EMR") system, which, upon information and belief, requires certain records to be retained in the system.[92]

---

[91] *Id.*

[92] *Id.*

117.    In the same job posting seeking physicians specializing in "Obesity Medicine," Mochi Health tells prospective physician candidates that "[b]y joining our team, you will…[u]tilize advanced tools like [Mochi Health's] custom-built EMR and obesity-specific protocols."[93]

118.    Mochi Health also improperly advertises and coordinates medical services, activities the Board exclusively reserves for licensed physicians. As mentioned above, Ms. Ahmad holds herself out as a "physician" when advertising Mochi Health's medical services. Likewise, on social media, Ms. Ahmad advertises Mochi Health's medical services and encourages individuals to sign up using referral codes, or digital vouchers.

**C.    Mochi Health's Control and Undue Influence over Patient Prescriptions**

119.    Despite California's and other states' prohibitions on the corporate practice of medicine, Mochi Health unlawfully influences its physicians' practice of medicine and otherwise engages in unfair and unlawful practices regarding the practice of medicine by unlicensed persons and corporations.

120.    Mochi Health has and continues to violate California's and other states' prohibition on the practice of medicine by unlicensed individuals and corporations, and other California laws, by changing the dosing and formulation of compounded semaglutide. The company has changed patient prescriptions *en masse*, tweaking the formula of its Unapproved Compounded Drugs and mixing them with unapproved and untested additives.

121.    For example, prior to December 2024, Mochi Health offered its knockoff semaglutide in dosages similar to those of Novo Nordisk's Wegovy® and Ozempic® medicines: 0.25 mg, 0.5. mg, 1 mg, 1.7 mg, 2 mg, and 2.4 mg.

122.    But as 2024 came to an end, Mochi Health unilaterally changed the dosages of its Unapproved Compounded Drugs to non-standard dosages, and it did so automatically and without any physician consultations.

123.    After December 2024, patients who had previously been prescribed 1 mg of Mochi Health's Unapproved Compounded Drugs were automatically transitioned to a new dose of 0.88 mg.

---

[93] *Id.*

Likewise, patients who had previously been prescribed 1.7 mg were now transitioned to 1.5 mg. The previous dosages that patients had come to rely on were no longer available.[94]



124.    Mochi Health's mass change was made without any advance warning to patients and without any physician input. Indeed, Mochi Health made clear that it was attempting to control prescriber decision making: the company said it was making this change to "ensure that patients *and their providers* have increased customization ability with [its] compounded medications."[95] Despite its attempts to disguise its language as a means to empower patients and prescribers, Mochi Health revealed that it—not Mochi Medical nor its physicians—controlled patient prescription guidelines.

125.    In the same announcement, Mochi Health also told patients that "[they] can always request a dose increase at any time" if they "don't like [their] new dose."[96] Making a prescription change was as easy as "selecting the next highest dose from the drop-down menu when [requesting a] refill."[97]

---

[94] JoinMochi-Info, *Compounded medication doses are changing with Mochi!*, REDDIT (Dec. 17, 2024), https://www.reddit.com/user/JoinMochi-Info/comments/1hgqy40/compounded_medication_doses_are_changing_with/.

[95] *Id*.

[96] *Id*.

[97] *Id*.

126.    One customer confirmed that their request for a new dosage was almost instantaneously approved: "I just upped my dose using the drop down option & it was immediately approved."[98] Upon information and belief, this change was approved without any good-faith physician consultation.



127.    Similarly, Mochi Health has also manipulated the formulation of Unapproved Compounded Drugs by including various additives that are not FDA-approved and have not been studied in a clinical setting. Mochi Health has made these changes without any determination of medical necessity.

128.    For example, one Reddit user complained that their compounded semaglutide had recently been mixed with vitamin B12. In response, another user explained Mochi Health's scheme: "Yes, it's become practically impossible [to be receive semaglutide without additives] due to the legal proceedings. The B12 added makes it different enough for compounding pharmacies to argue it's not the same medication as what Novo Nordisk is selling."[99]

---

[98] *Id.*

[99] Zealousideal_Art_233, *Is it true what we can no longer get just straight Sema with no b12 mixed in?*, REDDIT (May 22, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1kt6o4s/is_it_true_that_we_can_no_longer_get_j ust/.



129.    Another patient ran into the same problem. "On the app it now's [sic] says that the refill dose [of compounded semaglutide] has b12 in it," the user said, "It seems like they are now adding to their compounding?"[100]

---

[100] Lucky-Sun-3648, *B-12 added to new refill doses*, REDDIT (Mar. 20, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jfz7kb/b12_added_to_new_refill_doses/.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



130.    A different Reddit user replied to the post, explaining that their provider *explicitly told them that Mochi Health was tweaking the formulations of its Unapproved Compounded Drugs to skirt*

33

*the law.* The user said, "My provider said due to everything going on they needed to 'tweak' the medication and so it's not a copy of the brand name."[101]

131.    Alarmingly, none of these patients learned about these changes through their health care providers. Instead, they learned that the Unapproved Compounded Drugs that they were injecting into their bodies were being changed through Mochi Health's automated telehealth platform.

132.    In a separate post, Mochi Health opined on its use of vitamin B12 in its Unapproved Compounded Drugs. Mochi Health explained to a user that "whether your medication will have [B12] depends on if your state is supplied by [a] particular pharmacy" and *not* a medical indication, as required by law.[102]

133.    In the same post, Mochi Health offered the user medical advice and made medically dubious claims. The company told the user, "we can also reassure you that the addition of B12 is not detrimental to your health in any way. In fact, B12 is just an essential vitamin that's used by our bodies to create new blood cells and perform an array of other important biological processes."[103]

134.    In reality, ingesting B12 can have side effects and, in some cases, cause allergic reactions.[104] Mochi Health's own "Content Developer," Eva Shelton, acknowledged these potential risks in an online essay, explaining that "there is no solid evidence that vitamin B12 injections is [sic] effective in weight loss, and the potentially serious risks may outweigh the benefits."[105] Those risks can include "allergic reaction, heart problems, fluid build up in the lungs, electrolyte disturbances, diarrhea, swelling" and "increased risk of cancer."[106]

---

[101] *Id.*

[102] JoinMochi-Info, *Do all mochi meds contain b12?*, REDDIT (Aug. 29, 2024), https://www.reddit.com/r/JoinMochiHealth/comments/1f44iup/do_all_mochi_meds_contain_b12/.

[103] *Id.*

[104] Cronkleton, Emily, *Can Vitamin B12 Cause Side Effects?*, Healthline (last updated Feb. 24, 2025), https://www.healthline.com/health/food-nutrition/vitamin-b12-side-effects.

[105] Shelton, Eva, *Do weight loss shots and pills really work?,* MEDIUM (Apr. 9, 2022), https://medium.com/@sheltoneva79/do-weight-loss-shots-and-pills-really-work-430e6563e418.

[106] *Id.*



135.    Mochi Health made these changes for no other reason than to maximize its profits, at the expense of patients and in violation of the law. Mochi Health changed patient prescriptions *en masse* despite California's ban on the practice of medicine by unlicensed individuals and corporations, and even though California explicitly prohibits the prescription, dispensing, and furnishing of prescription drugs where there is no "medical indication" for doing so. *See* Cal. Bus. & Prof. Code § 2242.

136.    By changing patient dosages and formulations *en masse*, Mochi Health placed the health of thousands of people at risk. Changes to patients' dosage schedules and formulations involve risks that are best discussed with their health care providers. Patients cannot understand and appreciate those risks when their prescriptions are unilaterally changed by a corporate entity that only has profit—and not their best interests—in mind.

**D.      Mochi Health Manipulates Patient Prescriptions Without Good Faith Examination or Medical Indication**

137.    Mochi Health has not only violated California's prohibition on the unlicensed, corporate practice of medicine by changing patients' prescriptions *en masse*, but also by "[p]rescribing, dispensing, or furnishing dangerous drugs as defined in Section 4022 [*i.e.*, a prescription drug] without an appropriate prior examination and a medical indication, [which] constitutes unprofessional conduct."

Bus. & Prof. Code § 2242. Under California law, physicians must comply with "the appropriate standard of care," which, includes "a prior examination and a medical indication" that a prescription is warranted.

138.    This standard of care cannot be met where company employees without medical licenses direct patient medical care and where the company manipulates prescriptions *en masse* for business purposes. As described above, that is the case here.

III.    **Mochi Violates the Lanham Act and California Law by Engaging in False Advertising in Connection With Its Sale of Unapproved Compounded Drugs**

139.    Despite the foregoing, Mochi has made and continues to make false and misleading representations to patients regarding the nature of its Unapproved Compounded Drugs.

140.    Mochi promotes its Unapproved Compounded Drugs by operating and advertising a telehealth clinic, including through its website.

141.    Mochi has falsely advertised and continues to falsely advertise its Unapproved Compounded Drugs by making statements that describe the Ozempic®, Wegovy®, and Rybelsus® medicines but that are false or misleading when in reference to Defendant's Unapproved Compounded Drugs.

142.    Mochi has claimed or implied and continues to claim or imply that its Unapproved Compounded Drugs have been approved by FDA or have been reviewed by FDA for safety, effectiveness, and quality.

143.    On its website, Mochi makes false and misleading representations regarding approval by FDA. It claims, among other statements, "Semaglutide is an FDA-approved compound that is used in the management of type 2 diabetes and obesity."[107]

---

[107] Mochi Health, *Semaglutide for Weight Loss: Semaglutide Side Effects & Benefits* (last updated Mar. 17, 2025), https://joinmochi.com/blogs/semaglutide-for-weight-loss.

# Semaglutide for Weight Loss

Wegovy®, Rybelsus, or Ozempic®? So many options to choose from! Scroll down and learn more about these semaglutide-using medications.

## What is Semaglutide?

Semaglutide is an FDA-approved compound that is used in the management of type 2 diabetes and obesity. Semaglutide is available in different formulations, including subcutaneous injection (Ozempic and Wegovy) and oral tablet (Rybelsus). Ozempic® and Rybelsus are FDA-approved for the management of type 2 diabetes and can be used off-label to treat obesity. Wegovy® is the only form of semaglutide that is FDA-approved to manage obesity. The other difference between Wegovy® and Ozempic® is the dose; however, they are functionally the same medication.

144.    Contrary to Mochi's representations, FDA has made no such approval for a semaglutide peptide generally. Instead, FDA has approved three of Novo Nordisk's complete medicines, which contain semaglutide for the specific indications outlined in the preceding paragraphs.

145.    Mochi's false representations mislead customers into believing, incorrectly, that the product with "semaglutide" offered by Defendants has been reviewed and approved by FDA for safety and effectiveness.

146.    Mochi's labels, advertising, and promotional materials are false and misleading, suggesting or stating an association with Plaintiffs' FDA-approved Ozempic® and Wegovy® medicines when no such association exists.

147.    Specifically, Mochi's website includes Novo Nordisk's Ozempic® and Wegovy® marks and an image of an authentic Ozempic® injector pen despite, upon information and belief, not offering for sale nor prescribing Novo Nordisk's FDA-approved Ozempic® and Wegovy® medicines; instead, Mochi sells its Unapproved Compounded Drugs.[108]

---

[108] Mochi Health - Medications, (last visited July 27, 2025) https://joinmochi.com/medications.



148.    There is no need for Mochi to use the Ozempic® and Wegovy® trademarks to advertise or promote its Unapproved Compounded Drugs purporting to contain "semaglutide," other than to trade on the reputation of Plaintiffs and to create confusion in the marketplace or mislead the public regarding the origin, identity, or source of Mochi's Unapproved Compounded Drugs.

149.    Novo Nordisk is not directly or indirectly supplying semaglutide to Mochi or any compounding pharmacies from which it may be sourcing their Unapproved Compounded Drugs.

150.    FDA has not reviewed the "semaglutide" allegedly in Mochi's Unapproved Compounded Drugs for safety, effectiveness, or quality, or otherwise as equivalent in safety, effectiveness, or quality to, Novo Nordisk's medicines.

151.    Mochi has no basis to compare the "semaglutide" allegedly in its Unapproved Compounded Drugs to Novo Nordisk's FDA-approved medications containing semaglutide.

152.    Mochi further has falsely claimed or implied and continues to falsely claim or imply that its Unapproved Compounded Drugs have been subjected to clinical studies and trials, or have otherwise achieved therapeutic outcomes attributable to the Wegovy®, Ozempic®, and Rybelsus® medicines.

153.    On its website, Mochi in promotional materials refers to clinical trials that, on information and belief, did not involve the semaglutide product sold by Mochi: "Clinical trials have shown that semaglutide significantly reduces body weight in non-diabetic individuals."[109]

---

**The Science Behind Semaglutide and Weight Loss**

Semaglutide works by mimicking a hormone called GLP-1 (glucagon-like peptide-1) that targets areas of the brain involved in regulating appetite and food intake. (4) When administered, semaglutide slows gastric emptying, making you feel fuller for longer. (5) It also regulates glucagon and insulin secretion in response to meals, which helps maintain balanced blood sugar levels. (4)

Clinical trials have shown that semaglutide significantly reduces body weight in non-diabetic individuals. (1,7). Participants who received semaglutide in the clinical trial "Once-Weekly Semaglutide in Adults with Overweight or Obesity" were able to lose 5% - 15% or more of their baseline body weight at week 68 compared to those who received a placebo. Semaglutide is one of the most effective weight loss medications available.

---

154.    Mochi's website also, in promotional materials for its Unapproved Compounded Drugs, contain "sources" that redirect to the clinical studies and trials to which the Ozempic®, Wegovy®, and Rybelsus® medicines were subject.[110]

---

[109] Mochi Health, *Semaglutide Dosage for Weight Loss: Guide for Non-Diabetics* (last updated Dec. 19, 2024) https://joinmochi.com/blogs/semaglutide-for-weight-loss-in-non-diabetics-dosage.

[110] *Id.*

### Sources

1. Wilding, J. P. H., Batterham, R. L., Calanna, S., Davies, M., Van Gaal, L. F., Lingvay, I., McGowan, B. M., Rosenstock, J., Tran, M. T. D., Wadden, T. A., Wharton, S., Yokote, K., Zeuthen, N., Kushner, R. F., & STEP 1 Study Group (2021). Once-Weekly Semaglutide in Adults with Overweight or Obesity. *The New England journal of medicine*, *384*(11), 989–1002. https://www.nejm.org/doi/full/10.1056/NEJMoa2032183

2. Food and Drug Administration. Ozempic (semaglutide) injection prescribing information, revised 2020. https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/209637s003lbl.pdf

3. Lincoff, A. M., Brown-Frandsen, K., Colhoun, H. M., Deanfield, J., Emerson, S. S., Esbjerg, S., Hardt-Lindberg, S., Hovingh, G. K., Kahn, S. E., Kushner, R. F., Lingvay, I., Oral, T. K., Michelsen, M. M., Plutzky, J., Tornøe, C. W., Ryan, D. H., & SELECT Trial Investigators (2023). Semaglutide and Cardiovascular Outcomes in Obesity without Diabetes. *The New England journal of medicine*, *389*(24), 2221–2232. https://www.nejm.org/doi/full/10.1056/NEJMoa2307563

4. Blundell, J., Finlayson, G., Axelsen, M., Flint, A., Gibbons, C., Kvist, T., & Hjerpsted, J. B. (2017). Effects of once-weekly semaglutide on appetite, energy intake, control of eating, food preference and body weight in subjects with obesity. *Diabetes, obesity & metabolism*, *19*(9), 1242–1251. https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.12932

5. Chaudhry, A., Gabriel, B., Noor, J., Jawad, S., & Challa, S. R. (2024). Tendency of Semaglutide to Induce Gastroparesis: A Case Report. *Cureus*, *16*(1), e52564. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10874596/#:~:text=The%20exact%20mechanisr

6. Marathe, C. S., Rayner, C. K., Jones, K. L., & Horowitz, M. (2013). Relationships between gastric emptying, postprandial glycemia, and incretin hormones. *Diabetes care*, *36*(5), 1396–1405. https://diabetesjournals.org/care/article/36/5/1396/29534/Relationships-Between-Gastric-Emptying

7. Ryan, D.H., Lingvay, I., Deanfield, J. *et al.* Long-term weight loss effects of semaglutide in obesity without diabetes in the SELECT trial. *Nat Med* (2024). https://doi.org/10.1038/s41591-024-02996-7

155.    On information and belief, Mochi has not conducted any placebo-controlled or clinical studies on its Unapproved Compounded Drugs and is instead misleadingly referring to studies of Novo Nordisk's FDA-approved medicines to promote its Unapproved Compounded Drugs.

156.    On information and belief, Mochi has engaged in these unlawful practices to attract customers and generate revenues and profits.

157.    Mochi's false and misleading statements and practices are likely to cause mistake and deception in the marketplace.

158.    Mochi's false and misleading marketing is also likely to expose patients to unnecessary risks. Patients who mistakenly believe Mochi to be offering Novo Nordisk's FDA-approved medicines, or equivalent thereto, are unlikely to understand the unique risks associated with, or the lack of clinical trials or testing establishing the safety and effectiveness of, Mochi's Unapproved Compounded Drugs.[111]

159.    On information and belief, unless enjoined by this Court, Mochi will continue to falsely advertise its products in violation of Plaintiffs' rights.

160.    On information and belief, unless enjoined by this Court, Mochi's conduct will continue to cause mistake and deception.

## FIRST CAUSE OF ACTION

**(Defendant's False and Misleading Advertising and Promotion
in Violation of 15 U.S.C. § 1125(a)(1)(B)) (False Statements of FDA Approval, Generic
Equivalence, and Clinical Trial and Study) (Against Mochi Health Corp., Mochi Medical CA,
P.C., and Mochi Medical P.A.)**

161.    Plaintiffs reallege and incorporate each allegation in the preceding paragraphs of this Complaint as though fully set forth here.

162.    Defendants' practices, as described in this Complaint, constitute unfair competition and false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

163.    Defendants have violated the Lanham Act by using false or misleading descriptions of fact and false or misleading representations of fact in its commercial advertising or promotion that

---

[111] *See, e.g.*, Dozens Say They Lost Eyesight After Routine Surgery Using Compounded Pharmacy Drugs, WFAA, https://www.wfaa.com/article/news/do-not-publish-yet/287-5f002ed3-e110-4063-9959-a2e5f54b5097 (reporting mistaken belief of patient taking a compounded drug that "every pill you take, every shot you take is tested"); FDA Alerts Health Care Providers, Compounders and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products, https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded?utm_medium=email&utm_source=govdelivery ("Compounded drugs pose a higher risk to patients than FDA-approved drugs because compounded drugs do not undergo FDA premarket review for safety, quality or effectiveness.").

41

misrepresent the nature, characteristics, and qualities of Mochi Health's business practices and products, as set forth above.

164.    Defendants have also engaged in other false or misleading advertising and promotion intended to assure patients that Defendants' practices are lawful. On information and belief, Defendants provide patients who purchase Defendants' Unapproved Compounded Drugs (or who Defendants are trying to persuade to purchase its drugs) information that makes false or misleading statements, including those described herein and in the exhibits hereto.

165.    The above-described acts of Defendants, if not enjoined by this Court, are likely to deceive members of the general public.

166.    The above-described acts of Defendants have irreparably harmed and, if not enjoined, will continue to irreparably harm Plaintiffs.

167.    The above-described acts of Defendants have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from confusion, mistake, and deception.

168.    By reason of Defendants' acts as alleged above, Plaintiffs have suffered and will continue to suffer injuries, including injury to Plaintiffs' business reputation.

169.    Because Plaintiffs' remedies at law are not adequate to compensate for all the injuries inflicted by Defendants, Plaintiffs are entitled to entry of preliminary and permanent injunctive relief requiring Defendants to cease its false and misleading advertising and promotion and unfair competitive practices.

170.    Because the above-described acts of Defendants are willful, Plaintiffs are entitled to disgorgement of Defendants' profits (enhanced at the Court's discretion), treble damages, and costs under 15 U.S.C. § 1117.

171.    This case is exceptional, making Plaintiffs eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

**SECOND CAUSE OF ACTION**

**(False Advertising in Violation of California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq*.) (False Statements of FDA Approval, Generic Equivalence, and Clinical Trial and Study) (Against Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A.)**

172.     Plaintiffs reallege and incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

173.     California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, prohibits false and misleading statements in connection with the sale of goods.

174.     Defendants violated this act by disseminating false and misleading statements about their Unapproved Compounded Drugs.

175.     Defendants knew or should have known these statements were false and misleading.

176.     Plaintiffs have suffered injury as a result of these violations because Defendants' false and misleading advertising has diverted business from Plaintiffs, causing lost sales and profits, and has damaged its goodwill with former, existing, and potential customers.

177.     The Court should enter preliminary and permanent injunctive relief, in addition to awarding disgorgement of Defendants' profits attributable to Defendant's statements to Plaintiffs.

**THIRD CAUSE OF ACTION**

**(Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.) (Unlawful Corporate Control of Practice of Medicine and Prescription Practices) (Against Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A.)**

178.     Novo Nordisk realleges and incorporates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

179.     The violations of law described in this Complaint have been, and are being, carried out and directed wholly or in part within the County of San Francisco and other locations within the State of California where Mochi Health Corp. does business.

180.     California Business and Professions Code § 17200 prohibits "unlawful, unfair or fraudulent business practices."

43

181.    Mochi Health Corp. has violated California's Unfair Competition Law by engaging in the unlawful business practices that Mochi Health Corp. employs to promote and sell their Unapproved Compounded Drugs in violation of California law.

182.    Mochi Health Corp. has engaged and continues to engage in unlawful and unfair business acts or practices in violation of Section 17200. Such acts and practices include the following:

- Unlawfully engaging in and aiding and abetting the unlawful Corporate Practice of Medicine within the State of California in violation of Business & Professions Code §§ 2400, 2502 *et al.*

- Unlawfully prescribing medications without an appropriate prior examination by a physician and without the identification of a medical indication for the modification. *Id.*

- Unlawfully prescribing drugs without conducting a good-faith exam.

183.    The business practices that Mochi Health Corp. has employed to promote and sell Unapproved Compounded Drugs constitute "unlawful, unfair, or fraudulent" conduct under California's Unfair Competition Law. Such practices include permitting corporate interests to exert undue control over aspects of the physician-patient relationship, as described in Section II. The business practices further constitute "unlawful, unfair, or fraudulent" conduct under California's Unfair Competition Law by adding and modifying additives to drug products without examining the patient, and by prescribing oral and injectable drug products Defendants know are not personalized.

184.    Likewise, Mochi Medical CA, P.C. and Mochi Medical P.A ("Mochi Medical Groups") have aided and abetted Mochi Health Corp.'s unlawful corporate practice of medicine by following its directives as an unlicensed corporate entity in violation of California Business & Professions Code §§ 2400, 2502 *et al*.

185.    Mochi Health Corp.'s unfair and unlawful conduct (and Mochi Medical Groups' aid in perpetuating this unlawful conduct) is interfering with Novo Nordisk's ability to conduct its business. As a direct and proximate result of Mochi Health Corp.'s false and misleading campaign, Novo is suffering immediate and continuing, competitive, irreparable injury for which there is no adequate remedy at law.

44

186.    As a direct and proximate result of Mochi Health Corp.'s deceptive and unlawful practices, Mochi Health Corp. has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of goodwill associated with Novo Nordisk's semaglutide medicines. Novo Nordisk has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

187.    Novo Nordisk is entitled to all remedies available under California's Unfair Competition Law, including injunctive relief, restitution, and attorneys' fees.

## FOURTH CAUSE OF ACTION

### Unfair Competition in Violation of the Common Law (Against Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A.)

188.    Plaintiffs reallege and incorporate each allegation in the preceding paragraphs of this Complaint as though fully set forth here.

189.    The above-described acts of Mochi Health, Mochi Medical CA, P.C., and Mochi Medical P.A. constitute common law unfair competition.

190.    The above-described acts of Mochi Health, Mochi Medical CA, P.C., and Mochi Medical P.A. unfairly and wrongfully exploit Plaintiffs' goodwill and reputation.

191.    The above-described acts of Mochi Health, Mochi Medical CA, P.C., and Mochi Medical P.A. have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from confusion, mistake, and deception.

192.    Because Plaintiffs' remedies at law are not adequate to compensate for the injuries inflicted by Mochi Health, Mochi Medical CA, P.C., and Mochi Medical P.A., Plaintiffs are entitled to entry of preliminary and permanent injunctive relief, in addition to monetary relief in the form of disgorgement of Defendants' profits and corrective advertising costs.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Mochi as follows:

1.      That the Court enter a judgment against Mochi Health, Mochi Medical CA, P.C., and Mochi Medical P.A. that they have:

     a.      Engaged in false and misleading advertising and promotion, in violation of 15 U.S.C. § 1125(a);

     b.      Engaged in unfair and deceptive trade practices under the common law of California and violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq*., and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

2.      That each of the above acts was willful.

3.      That the Court preliminarily and permanently enjoin and restrain Mochi Health, Mochi Medical CA, P.C., and Mochi Medical P.A. and their agents, servants, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Mochi Health, Mochi Medical CA, P.C., and Mochi Medical P.A., from:

     a.      using the Ozempic®, Wegovy®, and Rybelsus® marks, including (i) use in any manner likely to cause confusion or mistake, to deceive, or otherwise infringe Novo Nordisk's rights in the Ozempic®, Wegovy®, and Rybelsus® marks, or (ii) use in connection with the advertising, marketing, sale, or promotion of any Unapproved Compounded Drugs; and,

     b.      advertising, stating, or suggesting that any Unapproved Compounded Drugs, including any Unapproved Compounded Drugs that either are available, directly or indirectly, from or through Mochi or the use of which or access to which is facilitated by, or with the involvement of, Mochi:

          i.      are, or contain, genuine or authentic Novo Nordisk Ozempic®, Wegovy®, or Rybelsus® medicines;

          ii.      are sponsored by or associated with Novo Nordisk;

iii.    are approved by FDA; have been reviewed by FDA for safety, effectiveness, or quality; or have been demonstrated to FDA to be safe or effective for their intended use;

iv.    achieve or have been shown or proven to achieve therapeutic results, effects, or outcomes, including but not limited to by relying on or making reference to clinical trial results for Novo Nordisk's medicines;

v.    achieve or have been shown or proven to achieve therapeutic results, effects, or outcomes similar or identical to Novo Nordisk's medicines or are interchangeable with or equivalent to genuine Novo Nordisk medicines;

vi.    are associated or connected in any way with Novo Nordisk or Novo Nordisk's medicines; or

vii.    contain any ingredient (including semaglutide) that is supplied by Novo Nordisk, is approved by FDA, or is the same as any ingredient in any Novo Nordisk medicine.

c.    engaging in unfair and deceptive trade practices with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines; and

d.    engaging in deceptive acts or practices with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

4.    That the Court require Mochi Health, Mochi Medical CA, P.C., and Mochi Medical P.A. to disclose conspicuously and prominently in any public-facing materials for any Unapproved Compounded Drugs, including all advertising, marketing, and promotional materials, that: (a) the Unapproved Compounded Drugs are compounded drugs that have not been approved by FDA; have not been reviewed by FDA for safety, effectiveness, or quality; and have not been demonstrated to FDA to be safe or effective for their intended use; (b) the processes by which the compounded drugs are manufactured have not been reviewed by FDA; and (c) FDA-approved medicines containing semaglutide are available.

47

5.      That Plaintiffs be awarded monetary relief in the form of disgorgement of Mochi Health's, Mochi Medical CA, P.C.'s, and Mochi Medical P.A.'s profits for their false advertising and unfair and deceptive trade practices with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines and that this monetary relief be trebled due to their willfulness, in accordance with 15 U.S.C. § 1117 and any applicable state laws.

6.      That the Court award disgorgement to Plaintiffs of Mochi Health's, Mochi Medical CA, P.C.'s, and Mochi Medical P.A.'s profits resulting from their unfair and deceptive trade practices with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

7.      That Mochi Health, Mochi Medical CA, P.C., and Mochi Medical P.A. be ordered to account for and disgorge to Plaintiffs all amounts by which they have been unjustly enriched by reason of their unlawful actions with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

8.      That Plaintiffs be awarded punitive damages by reason of Mochi Health's, Mochi Medical CA, P.C.'s, and Mochi Medical P.A.'s willful unlawful actions with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

9.      For pre-judgment and post-judgment interest on all damages.

10.     That the Court award Plaintiffs their reasonable attorneys' fees pursuant to 15 U.S.C. § 1117 and any other applicable  provision of law.

11.     That the Court award Plaintiffs the costs of suit incurred herein.

12.     For such other or further relief as the Court may deem just and proper.

JURY DEMANDED

August 4, 2025                          Respectfully submitted,

By: /s/ Nathan E. Shafroth

Nathan E. Shafroth (Bar No. 232505)
nshafroth@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: +1 (415) 591-6091

48

Kevin B. Collins (*pro hac vice pending*)
kcollins@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-5598

Chase Woods (*pro hac vice pending*)
cwoods@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: +1 (202) 662-5889

***Attorneys for Plaintiffs NOVO***
***NORDISK A/S and NOVO***
***NORDISK INC.***

49