Nathan E. Shafroth (Bar No. 232505)
nshafroth@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

*Attorney for Plaintiffs Novo Nordisk A/S and
Novo Nordisk Inc.*

*Additional counsel listed on signature pages*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NOVO NORDISK A/S, NOVO NORDISK INC. | CASE NO. 5:25-cv-06563-EKL |
| Plaintiffs, | **AMENDED COMPLAINT** |
| v. | |
| MOCHI HEALTH CORP., MOCHI MEDICAL CA P.C., MOCHI MEDICAL P.A., | DEMAND FOR JURY TRIAL |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

THE PARTIES............................................................................................................. 5

JURISDICTION AND VENUE .................................................................................. 6

DIVISIONAL ASSIGNMENT.................................................................................... 6

I.     Facts Entitling Novo Nordisk to Relief ........................................................... 7

    A.     Novo Nordisk ......................................................................................... 7

    B.     Novo Nordisk's Semaglutide-Containing Medicines ............................ 8

    C.     The FDA Drug Approval Process ........................................................... 9

    D.     Compounded Drugs .............................................................................. 11

    E.     Government Warnings of Risks of Compounded Semaglutide.............. 11

    F.     Other Warnings About the Risks of Compounded Semaglutide ........... 15

    G.     Government Warnings About False and Misleading Advertisements Regarding
       Compounded Semaglutide .................................................................... 18

    H.     Despite Government Warnings, Consumers Have Been and Continue to Be
       Deceived and Misled About Compounded Drugs ................................ 19

    I.     Safety Risks of Unapproved Compounded Drugs ................................ 20

    J.     Adverse Events Reported After Taking Compounded Semaglutide Drugs.......... 23

    K.     Governing State and Federal Law ......................................................... 24

       1.     The Lanham Act ......................................................................... 24

       2.     California False Advertising Law ............................................... 25

       3.     California Unfair Competition Law............................................. 25

       4.     California Law Governing Corporate Practice of Medicine.................... 25

II.    Mochi Violates California Law by Engaging in the Unlicensed Corporate Practice of
    Medicine ........................................................................................................ 28

    A.     Mochi Health and Mochi Medical Are Controlled by Non-Physicians Who
       Influence Patient Care............................................................................ 28

    B.     Mochi Health Sells Its Unapproved Compounded Drugs Through Medical Groups
       Under Its Control .................................................................................. 31

    C.     Mochi Health's Control and Undue Influence over Patient Prescriptions............ 34

D.    Mochi Health Manipulates Patient Prescriptions Without Good Faith Examination or Medical Indication ................................................................ 40

III.    Mochi Health Violates the Lanham Act and California Law by Engaging in False Advertising in Connection With Its Sale of Unapproved Compounded Drugs ................ 41

A.    Mochi Health's False and Misleading Statements About the Personalized Nature of Its Unapproved Compounded Drugs ................................................ 41

B.    Mochi Health's False and Misleading Statements About the Quality and Safety of Its Unapproved Compounded Drugs vis-à-vis Novo Nordisk's FDA-Approved Medicines ................................................................................................ 45

C.    Mochi Health's False and Misleading Statements About the Quality, Safety, and Efficacy of Its Unapproved Compounded Drugs vis-à-vis Studies Analyzing Novo Nordisk's FDA-Approved Medicines ................................................ 48

D.    Mochi Health's False and Misleading Statements About the Quality and Effectiveness of its Unapproved Compounded Drugs in Comparison to Novo Nordisk's FDA-Approved Drugs ...................................................................... 51

FIRST CAUSE OF ACTION ............................................................................................ 56

SECOND CAUSE OF ACTION ...................................................................................... 57

THIRD CAUSE OF ACTION .......................................................................................... 58

FOURTH CAUSE OF ACTION ...................................................................................... 59

REQUEST FOR RELIEF ................................................................................................. 61

ii

# INTRODUCTION

1.       Plaintiffs Novo Nordisk A/S and Novo Nordisk Inc. (collectively, "Novo Nordisk") bring this Complaint in the interest of public safety and honest competition.

2.       Defendants Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical, P.A. (collectively, "Mochi") have jeopardized the public health and unfairly competed with Novo Nordisk by violating state and federal law in furtherance of their marketing of mass-produced compounded weight loss drugs, specifically compounded semaglutide.

3.       Plaintiffs and Defendants serve the same discrete pool of consumers: individuals seeking weight-loss medication containing semaglutide. Plaintiffs service this population by producing safely manufactured, FDA-approved medicines. Defendants scam this population by skirting the law and trading on the reputation of Plaintiffs' game-changing products.

4.       Defendants' actions have critically undermined the triad of patient care: the pharmacy-patient-prescriber relationship. States have enacted laws and regulations to govern the practice of pharmacy and medicine to ensure that these sectors are free of inappropriate corporate interference and can prioritize patient care and safety above all. States have also established trade laws to protect consumers from unfair and deceptive practices, especially those that could affect their health. Rather than following these laws, Defendants' scheme has chipped away and hollowed out these protections.

5.       Alongside state-level protections for patients, this nation's pharmaceuticals are governed and protected by an approval process that ensures the safety, effectiveness, and quality of medicines before they reach patients. This process gives the American public confidence in the medicines that millions take every day. Companies like Novo Nordisk use this process and diligently follow its myriad requirements for approval.

6.       Along these lines, Novo Nordisk's innovative molecule, semaglutide, is the active ingredient in three of its blockbuster medicines, marketed under the well-known trade names Ozempic®, Wegovy®, and Rybelsus®. The U.S. Food and Drug Administration ("FDA") reviewed Novo Nordisk's clinical trials and testing before determining that all three of these drugs are safe and effective. Novo Nordisk manufactures the only semaglutide active pharmaceutical ingredient ("API") that has been reviewed by FDA and is included in an FDA-approved medicine.

7.     FDA is clear that patients should receive FDA-approved treatments whenever possible because patients could be injured, hospitalized, or even die from taking compounded drugs such as the drugs marketed by the Defendants that purport to contain semaglutide. Because FDA does not review the safety, effectiveness, or quality of these drugs before they are marketed, these drugs may be contaminated or contain too much or too little of the key active ingredient.

8.     Given these safety concerns, most states developed laws prohibiting the sale or distribution of unapproved drugs to patients.

9.     Although for patients whose medical needs cannot be met by an FDA-approved drug, compounding[1] may be appropriate, FDA has always intended compounding as a narrow exception to its drug approval process.[2]

10.     State and federal law place conditions on compounded drugs for them to qualify for this narrow exception, to guard against entities compounding drugs acting as unlicensed, unregulated drug manufacturers selling drugs that could be dangerous to patients.

11.     By exploiting the narrow compounding exception in a way that subverts the drug approval process and undermines patient safety, Defendants have made these dangers a reality.

12.     The shortage of Novo Nordisk's semaglutide injection products ended February 21, 2025, although FDA provided a 90-day window to allow outsourcing facilities to "facilitate an orderly

---

[1] Compounding is a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient. *See* FDA, *Human Drug Compounding* (last updated May 15, 2025), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding, (last visited Oct. 27, 2025).

[2] Additionally, FDA permits temporary, mass compounding to meet consumer demand after it has declared a drug to be in "shortage." In this context, "shortage" means "a period of time when the demand or projected demand for the drug within the United States exceeds the supply of the drug." *See* Section 506C(h)(2) (21 U.S.C. 356c) of the Food, Drug, and Cosmetic Act; *see also* CFR 314.81(b)(3)(iii)(*f*). FDA receives input regarding drug shortages and potential drug shortages from numerous stakeholders, including manufacturers, patients, healthcare providers, and others, including compounders. On August 23, 2022, Ozempic® was added to FDA's drug shortage list; likewise, on March 31, 2022, Wegovy® was added to FDA's shortage list. These shortages were resolved on February 21, 2025.

transition" from their compounded drugs to FDA-approved semaglutide medicines.[3]

13.    Recognizing that their ability to compound "copies" of Novo Nordisk's semaglutide medicines would soon close, Defendants claimed to shift their focus to providing "personalized" versions of compounded drug products that purport to contain semaglutide, but that have not been approved by FDA ("Unapproved Compounded Drugs") under a different federal exemption.

14.    Non-physician Mochi Health executives have regularly interfered with, and controlled, physicians' prescribing decisions by orchestrating a scheme in which the drugs marketed by Defendants are in no meaningful way "tailored" to the particular medical needs of any of the tens of thousands of patients to whom Mochi Health has been selling these medicines.

15.    Rather, Mochi Health has fabricated a pre-set selection of dosages created to be just different enough from the FDA-approved doses of Novo Nordisk's medicines to carry out this scheme. Moreover, it has continued to offer these Unapproved Compounded Drugs to thousands of different patients without modification.

16.    Mochi has effectuated its scheme by sowing confusion among consumers—it has published numerous false and misleading statements about the nature of its Unapproved Compounded Drugs and Novo Nordisk's FDA-approved medicines to convince consumers that they are simply buying the same product under a different name. For example, Mochi makes little to no attempt to distinguish between the two products on its website, instead claiming that Novo Nordisk's FDA-approved medicines are simply "brand-name"[4] versions of the "FDA-approved compound"[5] semaglutide.

---

[3] Letter from Jacqueline Corrigan-Curay (Acting Director, Center for Drug Evaluation and Research, FDA) to Robert Fischer (Director, Regulatory Affairs, Novo Nordisk Inc.) (Feb. 21, 2025), https://www.fda.gov/media/185526/download.

[4] Mochi Health, *Tirzepatide vs Semaglutide: Cost, Side Effects, & Dosage,* https://joinmochi.com/blogs/tirzepatide-vs-semaglutide?utm_source=reddit&utm_medium=social&utm_campaign=reddit_post (last visited Oct. 27, 2025).

[5] Mochi Health, *Semaglutide for Weight Loss: Semaglutide Side Effects & Benefits*, https://joinmochi.com/blogs/semaglutide-for-weight-loss (last visited Oct. 27, 2025).

17.    To the extent that Mochi explains the differences between the two products, it says that its Unapproved Compounded Drugs "fill an important gap as they are often more affordable and accessible. Ozempic and Wegovy are often in shortage, making it difficult for patients to stay on their treatment plan."[6]

18.    Defendants' statements are false: semaglutide is not an FDA-approved compound; instead, Novo Nordisk's Ozempic®, Wegovy®, and Rybelsus® are FDA-approved medications. Likewise, Novo Nordisk's medicines have been declared to be in shortage exactly *once* and that shortage ended *eight months ago*.

19.    Through its false and misleading advertising, Mochi Health directs patients away from safe and effective FDA-approved medications and toward clinically untested, unapproved, and potentially unsafe drugs.

20.    Defendants built their compounded semaglutide business by deceiving patients with false and misleading advertisements, selling an unapproved and misbranded drug, exerting so much inappropriate control over physicians' prescribing practices that Defendants are, in essence, practicing medicine, and leveraging these violations to engage in unfair and deceptive trade practices. Defendants then fraudulently sold hundreds of thousands of Unapproved Compounded Drugs, knowing that these drugs violate state law and could put patients at risk.

21.    Defendants' actions could lead to devastating consequences for the public. A former FDA commissioner observed that compounding of semaglutide is a "reckless national experiment," and healthcare providers have warned that such compounding is "the largest uncontrolled, unconsented human experiment of our time."[7] The Federal Bureau of Investigation ("FBI") has indicated that

---

[6] Mochi Health, *Tirzepatide vs Semaglutide: Cost, Side Effects, & Dosage,* https://joinmochi.com/blogs/tirzepatide-vs-semaglutide?utm_source=reddit&utm_medium=social&utm_campaign=reddit_post (last visited Oct. 27, 2025).

[7] *See* The Obesity Society, *FDA-Approved vs. Compounded GLP-1s: Comparing Safety, Quality, and Transparency*, https://www.youtube.com/watch?v=BJ5DU6u6rZI (Mar. 24, 2025).

"[t]esting of the compounded drugs revealed some of the misrepresented compounds did not contain semaglutide and had large percentages of unknown drug impurities."[8]

22.     Not only are Defendants' actions endangering the public–they are injuring Novo Nordisk. As Defendants line their pockets selling an untested and inferior product that they falsely market as similar in all relevant aspects to Novo Nordisk's FDA-approved medicines, Novo Nordisk is injured by the associated decline in its market share, as well as by other consequences to the health of its business.

23.     It is clear that Defendants do not intend to end their unlawful enterprise. To the contrary, they have doubled down on pushing as many Unapproved Compounded Drugs to patients as possible.

24.     Defendants' scheme threatens to turn the drug approval process into a sham. Left to continue their unlawful activities, Defendants' organization would serve as a blueprint for mass production of compounded versions of medicines even if those drugs are not medically necessary for patients. It will also embolden other businesses to adopt similar models, in which corporate interests control the practice of medicine and place profits over patient safety.

25.     Novo Nordisk seeks declaratory, injunctive, and monetary relief, including a declaration that Defendants have engaged in unlawful conduct in connection with the manufacture and sale of compounded semaglutide products, an injunction against such conduct, and disgorgement of their illegal profits.

## THE PARTIES

26.     Plaintiff Novo Nordisk A/S ("NNAS") is a corporation organized and existing under the laws of the Kingdom of Denmark and has its principal place of business in Bagsværd, Denmark.

27.     NNAS developed the Ozempic®, Wegovy®, and Rybelsus® medicines and has granted to Novo Nordisk Inc. ("NNI") exclusive rights to market, advertise, promote, offer for sale, and sell those medicines in the United States.

28.     Plaintiff NNI is an indirect, wholly-owned subsidiary of NNAS, organized and existing under the laws of Delaware with a principal place of business in Plainsboro, New Jersey.

---

[8] *See* FBI, *Safety Concerns Related to Fraudulent Compounding Practices Associated with Weight Loss Drugs* (Feb. 28, 2025), https://www.ic3.gov/PSA/2025/PSA250228.

29.     NNI promotes, offers, and sells the Ozempic®, Wegovy®, and Rybelsus® medicines throughout the United States, including in this District.

30.     Defendants Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A., are a Delaware corporation, a California professional corporation, and a Florida professional association, respectively, each with a principal place of business at 161 Natoma St., San Francisco, CA 94105. Mochi is a telehealth platform that provides weight loss treatments. Mochi operates and conducts business in California, including by promoting and selling Unapproved Compounded Drugs within the State.

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over the Lanham Act cause of action pleaded herein pursuant to 15 U.S.C. § 1121, and 28 U.S.C. § 1331. Additionally, and in the alternative, the Court has subject matter jurisdiction on diversity grounds pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the matter in controversy exceeds $75,000.

32.     The Court has supplemental jurisdiction over the state causes of action pleaded herein pursuant to 28 U.S.C. § 1367(a), as it is part of the same case or controversy as the federal claim.

33.     Defendants Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A. are subject to personal jurisdiction in California because each has its principal place of business in California.

34.     Defendant Mochi Medical CA, P.C. is further subject to personal jurisdiction in California because it is incorporated in California.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial amount of the harms alleged took place in this District.

## DIVISIONAL ASSIGNMENT

36.     Pursuant to Civil L.R. 3-2(c), this case arises in the County of San Francisco, as a substantial part of the events or omissions giving rise to the claims occurred in the County of San Francisco. For example, Defendant Mochi Health, most notably, lists its principal place of business in the County of San Francisco.

## I.    Facts Entitling Novo Nordisk to Relief

### A.    Novo Nordisk

37.    Novo Nordisk is a healthcare company with a 100-year history of innovation in developing medicines to treat serious chronic diseases like diabetes and obesity.

38.    For more than a century, Novo Nordisk has been on the cutting edge of developing life-saving medicines. The company's roots can be traced to the early commercialization of the production of insulin in 1923. Today, Novo Nordisk's medicines provide relief for tens of millions throughout the world.

39.    Like other reputable pharmaceutical manufacturers that produce medicines at scale, Novo Nordisk produces its medicines in accordance with FDA requirements and under strict controls in its state-of-the-art facilities. Novo Nordisk employs thousands of professionals who have the necessary expertise to adhere to these quality and safety standards.

40.    Producing medicines in this way is a complex, science-based, and rigorous process. Novo Nordisk follows Current Good Manufacturing Practices ("cGMP"), the industry standards that help to ensure quality and safety throughout the design, monitoring, and control of its products across manufacturing processes and facilities. Such practices mean that Novo Nordisk, for example, has processes in place to detect and investigate product quality issues and to ensure the quality of its source materials when procuring its products.

41.    In addition, Novo Nordisk is required to comply with all applicable laws under the Federal Food, Drug, and Cosmetic Act ("FDCA") and manufactures its medicines under strict FDA oversight. By doing so, Novo Nordisk offers patients peace of mind that they are using medicines that meet the world's most rigorous quality and safety standards. Novo Nordisk's medicines are subject to exacting pre-approval testing for safety and efficacy under specific conditions for use; its manufacturing facilities are subject to routine FDA inspections; and the company conducts post-market surveillance and studies.

42.    Novo Nordisk's medicines also must be and always are accompanied by labels, instructions, and warnings, which themselves are approved by FDA. Novo Nordisk's medicines are FDA-approved as safe, effective, and of high quality.

B.    <u>**Novo Nordisk's Semaglutide-Containing Medicines**</u>

43.    The development of semaglutide is an example of Novo Nordisk's commitment to innovation for those living with chronic diseases. Semaglutide is the foundational molecule that serves as the primary ingredient for Novo Nordisk's three prescription-only medicines approved by FDA: Wegovy® (semaglutide) injection, Ozempic® (semaglutide) injection, and Rybelsus® (semaglutide) tablets.

44.    The Wegovy® medicine is indicated to reduce excess body weight and maintain weight reduction long-term in adults and children aged 12 years and older with obesity, and adults that are overweight with weight-related medical problems, along with a reduced calorie diet and increased physical activity. Wegovy® is also indicated, with a reduced calorie diet and increased physical activity, to reduce the risk of adverse cardiovascular events such as cardiovascular death, heart attack, or stroke in adults with known heart disease who are either obese or overweight.

45.    The Ozempic® medicine and the Rybelsus® medicine are indicated for adults with type 2 diabetes to improve blood sugar (glucose), along with diet and exercise. The Ozempic® medicine also lowers the risk of cardiovascular events such as stroke, heart attack or death in adults with type 2 diabetes and heart disease and reduces the risk of sustained estimated glomerular filtration rate ("eGFR") decline, end-stage kidney disease, and cardiovascular death in adults with type 2 diabetes and chronic kidney disease.

46.    Each of the Wegovy®, Ozempic®, and Rybelsus® medicines has a unique safety and efficacy profile which is set forth in its respective product label.

47.    The Wegovy®, Ozempic®, and Rybelsus® medicines are prescription-only medicines that should be prescribed only in direct consultation with, and under the supervision of, a licensed healthcare professional.

48.    The Wegovy®, Ozempic®, and Rybelsus® medicines have been extensively studied in clinical trials and are FDA-approved for the treatment of patients with serious chronic diseases.

49.    Novo Nordisk is the only company in the U.S. authorized to sell FDA-approved products containing semaglutide.

50.     FDA has not approved any generic versions of semaglutide medicines. To the contrary, FDA has sent warning letters to companies that have claimed that their unapproved products have the "same active ingredient as Ozempic®, Rybelsus®, and Wegovy®," noting that the Ozempic® and Wegovy® medicines are the only "two injectable semaglutide products FDA-approved for the U.S. market."[9]

51.     Novo Nordisk does not sell its semaglutide API to Defendants, compounding pharmacies, or outsourcing facilities for the purpose of compounding semaglutide products.

52.     Defendants market and sell to patients what this Complaint refers to as "Unapproved Compounded Drugs," *i.e.*, those produced and sold by the Defendants that they claim contain semaglutide but have not been approved by FDA.

### C.     The FDA Drug Approval Process

53.     FDA's drug approval process serves as the foundation of U.S. drug regulation. FDA's drug review process is recognized as the gold standard worldwide. New drugs in the U.S. must undergo a rigorous evaluation of safety, quality, and effectiveness before they can be sold.

54.     Testing new drugs and obtaining the required regulatory approval to sell them is time-consuming and costly ("[o]n average, it takes 10–15 years and costs $2.6 billion to develop one new medicine"[10]), but drug approval is essential to ensure the quality, safety, and effectiveness of new drugs, and approval is based on evidence.

55.     FDA approval is famously hard to earn. More than 90 percent of drug candidates ultimately fail.[11]

---

[9] FDA, *Warning Letter to Ozempen.com, MARCS-CMS 684435 — JUNE 24, 2024*, (last updated July 2, 2024) https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/ozempencom-684435-06242024#:~:text=WARNING%20LETTER&text=As%20discussed%20below%2C%20FDA%20has,new%20drugs%20and%20misbranded%20dru. (last visited Oct. 27, 2025).

[10] PhRMA, *Research and Development Policy Framework* (last updated Sept. 2024), https://phrma.org/policy-issues/research-development, (last visited Oct. 27, 2025).

[11] Biotechnology Innovation Organization, *Clinical Development Success Rates and Contributing Factors 2011-2020* at 3 (Feb. 2021), https://go.bio.org/rs/490-EHZ-999/images/ClinicalDevelopmentSuccessRates2011_2020.pdf (hereinafter "BIO 2021").

56.     Drug sponsors first subject the drug candidate to preclinical testing to determine if the product is reasonably safe for initial use in humans and if the drug candidate exhibits pharmacological activity that justifies commercial development. Based on data derived from preclinical testing, FDA permits the drug sponsor to move the drug candidate into the clinical trial stage, in which it is tested in human subjects through increasingly complex phases of studies, typically culminating in double-blind, multi-center, placebo-controlled clinical trials.

57.     Phase I clinical trials typically evaluate the drug candidate's safety and generate data that will inform a range of doses that are safe for use in further clinical testing. This determination typically culls a majority of drug candidates—for example, averaging across diseases, only 52 percent of drug candidates that make it to Phase I testing will progress to Phase II.[12]

58.     Phase II trials are typically designed to establish preliminarily the effectiveness in addition to further confirming safety of the drug for an indication over a range of doses and to develop additional data on its safety. Another swath of drug candidates is eliminated in Phase II: drug candidates progress from Phase II to Phase III at rates between 15 and 48.1 percent depending on disease type.[13] Phase III trials are designed to confirm the safety and effectiveness of a dose identified in Phase II trials in a larger patient population as well as to monitor side effects.

59.     Based on the data assembled during development in Phase I, Phase II, and Phase III clinical trials, a sponsor company can then submit a marketing application to FDA called a New Drug Application, where the sponsor requests that FDA approve the drug candidate for sale and marketing in the United States. The sponsor must identify every ingredient and component in its application to FDA.

60.     Once a drug is approved for manufacture and distribution, FDA conducts inspections to monitor compliance with cGMP and reviews the drug's labeling to ensure appropriate disclosure of side effects, warnings, and contraindications. FDA also requires manufacturers to track and trace each finished product, to promptly report all adverse events, and to conduct further post-approval studies.

---

[12] BIO 2021 at 7.

[13] *Id.*

D. **Compounded Drugs**

61.     Compounding is historically a practice in which a licensed pharmacist or physician combines, mixes or alters ingredients of a drug to create a medication tailored to the needs of an individual patient.[14] According to FDA, "compounded drugs are not FDA-approved," and "do not undergo FDA's review for safety, effectiveness and quality before they are marketed."[15]

62.     FDA has warned that "[u]necessary use of compounded drugs unnecessarily exposes patients to potentially serious health risks" and that "poor compounding practices can result in serious drug quality problems, such as contamination or a drug that contains too much or too little active ingredient . . . [which] can lead to serious patient injury and death."[16]

63.     Consistent with this warning, FDA recommends that compounded drugs "should only be used for patients whose medical needs cannot be met by an available FDA-approved drug."[17]

E. **Government Warnings of Risks of Compounded Semaglutide**

64.     Regulatory agencies in the United States and throughout the world have warned the public that taking unapproved compounded products that claim to contain semaglutide can endanger patients. FDA has publicly warned that compounded glucagon-like peptide-1 ("GLP-1") receptor agonists "can be risky for patients."[18]

---

[14] *See* FDA, Human Drug Compounding (last updated May 15, 2025), https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding, (last visited Oct. 27, 2025).

[15] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated September 25, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss, (last visited Oct. 27, 2025).

[16] FDA, *Compounding and the FDA: Questions and Answers* (last updated September. 15, 2024), https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers, (last visited Oct. 27, 2025).

[17] FDA, *FDA alerts health care providers, compounders and patients of dosing errors associated with compounded injectable semaglutide products* (last updated July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded, (last visited Oct. 27, 2025).

[18] *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated September 25, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss, (last visited Oct. 27, 2025).

65.    FDA also released a compounding risk alert to health care providers, compounders, and patients about dosing errors associated with compounded injectable semaglutide products.[19]

66.    FDA has also sent a letter to the Alliance for Pharmacy Compounding, the Federation of State Medical Boards, the National Association of Boards of Pharmacy, the National Council of State Boards of Nursing and the Outsourcing Facility Association highlighting additional factors that contribute to the adverse events associated with compounded drugs claiming to contain semaglutide, including starting patients on incorrect doses, changing the dose administration frequency or titrating on a schedule that deviates from that of Novo Nordisk's FDA-approved semaglutide medicines.[20]

67.    Federal lawmakers have also warned the public about "a surge in illegal and counterfeit anti-obesity medications…which include semaglutide…entering the U.S. from unregistered foreign entities."[21] On July 25, 2025, U.S. Representative Richard Hudson sent FDA Commissioner Marty Makary a letter inquiring about the agency's efforts to curb the spread of these Unapproved Compounded Drugs, noting that such products "may contain dangerously high concentrations of active ingredients, unknown compounds, or contaminants."[22] Therefore, "these substances pose a significant threat to consumer health, including the potential for adverse reactions, toxic exposure, or overdose."[23] Congressman Hudson's letter was signed by a bipartisan group of 80 members of the U.S. Congress.

68.    The FBI has also issued a public service announcement warning about the risks of compounded products claiming to contain semaglutide. The FBI indicated that "[t]esting of the

---

[19] FDA, *FDA alerts health care providers, compounders and patients of dosing errors associated with compounded injectable semaglutide products* (last updated July 26, 2024), https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded, (last visited Oct. 27, 2025).

[20] Letter from Shannon Glueck, Branch Chief, Compounding Branch 4, U.S. Food and Drug Administration to Philip Dickison, Chief Executive Officer, National Council of State Boards of Nursing (July 16, 2024), https://www.pa.gov/content/dam/copapwp-pagov/en/dos/department-and-offices/bpoa/nursing/fda-safety-alert.pdf.

[21] U.S. Representative Richard Hudson, *Letter to FDA Commissioner Marty Makary on Illegal and Counterfiet Anti-Obesity Medications*, (July 25, 2025) https://x.com/RepRichHudson/status/1948775451960193226/photo/1.

[22] *Id.*

[23] *Id.*

compounded drugs revealed some of the misrepresented compounds did not contain semaglutide and had large percentages of unknown drug impurities."[24] The FBI highlighted that providers are using compounded mixtures of unknown drugs that "do not contain semaglutide, drugs with high levels of impurities, and unsafe or unapproved drugs."[25] One southern-based medical spa and weight loss clinic reportedly offered and sold their own compounded "semaglutide" product, which used "'animal grade' semaglutide with vitamin B12."[26]

69.    At least 18 state boards of pharmacy, boards of medicine, and other state professional regulators have alerted licensees in their states about compounded products that claim to contain semaglutide.[27] For instance, the Alabama Board of Medical Examiners has cautioned that semaglutide

---

[24] *See* FBI, *Safety Concerns Related to Fraudulent Compounding Practices Associated with Weight Loss Drugs* (Feb. 28, 2025), https://www.ic3.gov/PSA/2025/PSA250228.

[25] *Id.*

[26] *Id.*

[27] *See, e.g.*, Ala. Bd. Pharmacy, *Compounding Semaglutide*, https://nabp.pharmacy/wp-content/uploads/2023/11/November-2023-Alabama-State-Newsletter.pdfe (Nov. 2023); Ala. State Bd. of Medical Examiners, *Declaratory Ruling of the Alabama State Board of Medical Examiners*, https://www.albme.gov/uploads/pdfs/BOPSemaglutide.DeclaratoryRuling_.pdf (Aug. 8, 2024); Health Professions Bureau of the Idaho Div. of Occupational and Prof'l. Licenses, Clinic Dispensing of GLP-1 Products, https://dopl.idaho.gov/wp-content/uploads/2024/06/Compounding-Letter.pdf (May 24, 2024); Ill. Dep't. of Fin. and Prof'l. Regul., *Consumer Alert: Compounded Weight Loss Drugs*, https://idfpr.illinois.gov/content/dam/soi/en/web/idfpr/forms/dpr/medical-minute-summer-2024.pdf (Summer 2024); Kan. Bd. Pharmacy, *Statement on Compounding and Dispensing of Compounded Semaglutide and Other GLP-1 Receptor Agonists*, https://www.pharmacy.ks.gov/home/showpublisheddocument/9120/638804875360815137 (Apr. 16, 2025); Ky. Bd. Pharmacy, *Semaglutide Compounding Guida*nce, https://pharmacy.ky.gov/professionals/Documents/GLP-1 Compounding Guidance 2025.pdf (2025); Meg Farris, *Low-cost weight loss drug banned in La.,* https://www.wwltv.com/article/news/health/weight-loss-wednesday/low-cost-weight-loss-drug-banned/289-d2608b63-f8c2-4eb4-9982-0530331d50ea, 4WWL (last updated Apr. 30, 2023) (reflecting ban by Louisiana Board of Pharmacy), (last visited Oct. 27, 2025); Minn. Bd. Pharmacy, Semaglutide and GLP-1 Drugs, https://mn.gov/boards/assets/July-2024-Minnesota-State-Newsletter_tcm21-632417.pdf (July 2024); Miss. Bd. Pharmacy, *Compounded Products Due to Shortage or Due to Special Patient Needs*, https://www.mbp.ms.gov/sites/default/files/inline-images/Semaglutide.compoundguidance %28002%29.pdf; Miss. State Bd. of Medical Licensure, *Guidance Regarding Semaglutide-Based Medications From the Mississippi State Board of Medical Licensure*, https://www.msbml.ms.gov/sites/default/files/news/Semaglutide Guidance 08-29-23.pdf (Aug. 29, 2023); N.J. Bd. Pharmacy, *Statement Concerning Semaglutide Compounding*, https://nabp.pharmacy/wp-content/uploads/2024/01/January-2024-New-Jersey-State-Newsletter.pdf (continued…)

products other than those manufactured by Novo Nordisk "may be contaminated, improperly stored and transported, or adulterated."[28]

70.    On February 19, 2025, a coalition of 38 state attorneys general urged FDA to take decisive action against "bad actors unlawfully profiting off the high demand for FDA-approved weight loss and diabetes drugs."[29] The letter sent by the Attorneys General encouraged FDA to "ramp up enforcement against any compounding pharmacies" due to the serious adverse events associated with contaminated drug products produced by compounding pharmacies under insanitary conditions.[30]

71.    Six state attorneys general also released separate alerts warning patients in their states about compounded drugs claiming to contain semaglutide.[31] For example, the Illinois Attorney General

---

(Jan. 2024); N.J. Office of the Attorney General, *Statement Concerning Semaglutide Compounding*, https://www.njconsumeraffairs.gov/phar/Documents/Semaglutide-Compounding-Statement-04282023.pdf (Nov. 6, 2023); Ohio Bd. Pharmacy, *FDA Alerts Health Care Providers, Compounders, and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products*, https://www.pharmacy.ohio.gov/documents/pubs/messages/2024-08-13 e-news august 2024.pdf (Aug. 2024); Or. Bd. Pharmacy, *Statement on Semaglutide*, https://www.oregon.gov/pharmacy/pages/position-statements.aspx (Feb. 6, 2025); S.D. Bd. Pharmacy, *Beware of Fraud and Counterfeit Popular Weight Loss Products*, https://doh.sd.gov/media/5urllipf/january-2024-south-dakota-state-news.pdf (Jan. 2024); Utah Bd. Pharmacy, *Compounded Semaglutide – Cautions and Concerns*, https://nabp.pharmacy/wp-content/uploads/2024/05/May-2024-Utah-State-Newsletter.pdf (May 2024); Wash. State Department of Health, *Statement on Compounding Semaglutide*, https://content.govdelivery.com/accounts/WADOH/bulletins/3b13be6 (Aug. 27, 2024); W. Va. Bd. Pharmacy, *Statement Concerning Semaglutide Compounding*, https://www.wvbop.com/admin/attachment/FINALSemaglutideCompoundingStatement21APR2023WVBoPdatedFV.pdf (Apr. 2023).

[28] Ala. Bd. Med. Exam'rs & Med. Licensure Comm'n, *Concerns with Semaglutide and Other GLP-1 Receptor Agonists*, (no date) https://www.albme.gov/press-release/concerns-with-semaglutide-and-other-glp-1-receptor-agonists, (last visited, Oct. 27, 2025).

[29] Letter from The National Association of Attorneys General to Acting Commissioner Sara Brenner, U.S. Food and Drug Administration (Feb. 19, 2025), https://www.naag.org/wp-content/uploads/2025/02/FDA-GLP-1-Ltrhead-e.pdf.

[30] *Id.*

[31] Office of the Illinois Attorney General Kwame Raoul, *Attorney General Raoul Reminds Illinois Residents to be Vigilant When Seeking GLP-1 Drugs for Weight Loss*, https://www.illinoisattorneygeneral.gov/news/story/updated-consumer-alertattorney-general-raoul-reminds-illinois-residents-to-be-vigilant-when-seeking-glp-1-drugs-for-weight-loss (Jan. 3, 2025); Office of South Carolina Attorney General Alan Wilson, *CONSUMER ALERT: Attorney General Alan Wilson warns consumers to be cautious when purchasing unapproved and compounded weight loss* (continued…)

alerted consumers that sellers advertising "name brand medications [such as Ozempic® and Wegovy®] are instead offering unapproved versions of these products that may put people's health at risk."[32] The attorney general further warned consumers about misleading advertising that claims to offer name brand GLP-1 medications when the seller is actually selling compounded drugs, which the attorney general affirms "are not the same as generic drugs."[33]

### F.    Other Warnings About the Risks of Compounded Semaglutide

72.     Patient and provider groups have also spoken out about the risks associated with compounded products claiming to contain semaglutide.[34] On December 2, 2024, the American Diabetes

---

*medications*, https://www.scag.gov/about-the-office/news/consumer-alert-attorney-general-alan-wilson-warns-consumers-to-be-cautious-when-purchasing-unapproved-and-compounded-weight-loss-medications/ (Jan. 3, 2025); Office of Ohio Attorney General Dave Yost, *AG Yost Warns Med Spas: Stop Misleading Consumers About Weight-Loss Drugs*, https://www.ohioattorneygeneral.gov/Media/News-Releases/April-2025/AG-Yost-Warns-Med-Spas-Stop-Misleading-Consumers-A (Apr. 16, 2025); Office of Tennessee Attorney General Jonathan Skrmetti, *Tennessee Attorney General's Consumer Protection Division Warns Consumers of Counterfeit Weight Loss Drugs*, https://www.tn.gov/content/dam/tn/attorneygeneral/documents/pr/2025/CPD_GLP1_Warning.pdf (Mar. 20, 2025); Office of Mississippi Attorney General Lynn Fitch, *AG Fitch Warns Mississippians of Unapproved and Compounded Weight Loss Medication*, https://attorneygenerallynnfitch.com/2025/05/06/ag-fitch-warns-mississippians-of-unapproved-and-compounded-weight-loss-medication-may-6-2025/ (May 6, 2025); Office of the Connecticut Attorney General William Tong, *Attorney General Tong Sues GLP-1 Weight Loss Drug Distributor Triggered Brand, Announces Investigation Into Made In China Over Sale of Untested, Unsafe "Research-Grade" Drugs to Connecticut Consumers*, https://portal.ct.gov/ag/press-releases/2025-press-releases/attorney-general-tong-sues-glp-1-weight-loss-drug-distributor-triggered-brand (May 21, 2025).

[32] Office of the Illinois Attorney General Kwame Raoul, *Attorney General Raoul Reminds Illinois Residents to be Vigilant When Seeking GLP-1 Drugs for Weight Loss* (last updated Jan. 3, 2025), https://www.illinoisattorneygeneral.gov/news/story/updated-consumer-alertattorney-general-raoul-reminds-illinois-residents-to-be-vigilant-when-seeking-glp-1-drugs-for-weight-loss.

[33] *Id.*

[34] *See, e.g.*, The Obesity Society, Obesity Action Coalition, & Obesity Medicine Association, *Leading Obesity Expert Organizations Release Statement to Patients on Compounded GLP-1 Alternatives*, https://www.obesityaction.org/wp-content/uploads/GLP-1-Compounded-Alternative-Statement_Final_Logos-1.pdf (Jan. 8, 2024); Endocrine Society, *Webinar will examine concerns around compounding anti-obesity medications*, https://www.endocrine.org/news-and-advocacy/news-room/2024/webinar-will-examine-concerns-around-compounding-anti-obesity-medications (Nov. 6, 2024); National Academies of the Sciences, Engineering, and Medicine, *New Weight Loss Drugs (GLP-1s) Explained: Science, Impact, Potential*, https://www.nationalacademies.org/event/43965_11- (continued…)

Association ("ADA") released a statement on compounded GLP-1 and dual glucose-dependent insulinotropic polypeptide ("GIP") and GLP-1 receptor agonists. The ADA "recommends against using non-FDA-approved compounded GLP-1 and dual GIP/GLP-1 RA products due to safety, quality, and effectiveness concerns and uncertainty about their content."[35]

73.     International regulators too have recognized the serious risks associated with compounded drugs claiming to contain semaglutide.

74.     In early 2025, Health Canada issued a recall notice for compounded "semaglutide" and pyridoxine drugs from an Alberta-based compounding pharmacy, highlighting that the products were "produced with an unauthorized active pharmaceutical ingredient."[36] On March 5, 2025, the South African Health Products Regulatory Authority ("SAHPRA") announced its intent to declare compounded drugs containing GLP-1 agonists "undesirable," and therefore unable to be sold, under South Africa's Medicines and Related Substances Act.[37] According to the Act, SAHPRA may declare a

---

[35] 2024_new-weight-loss-drugs-glp-1s-explained-science-impact-potential (Nov. 21, 2024); Pediatric Endocrine Society, *Statement on use of compounded semaglutide and other GLP-1 receptor agonists*, https://pedsendo.org/drug-shortages/statement-on-use-of-compounded-semaglutide-and-other-glp-1-receptor-agonists/ (Jan. 16, 2024); Joshua J. Neumiller et al., *Compounded GLP-1 and Dual GIP/GLP-1 Receptor Agonists: A Statement from the American Diabetes Association*, https://www.sochob.cl/web1/wp-content/uploads/2024/12/Compounded-GLP-1-and-Dual-GLP-GLP-1-Receptor-Agonists-A-Statement-from-the-Amer.pdf, 48 DIABETES CARE 177—181 (Feb. 2025); *Letter from Aimed Alliance, Alliance for Women's Health & Prevention, Association of Black Cardiologists, etc. to Acting Commissioner Sara Brenner, U.S. Food and Drug Administration*, https://www.obesityaction.org/wp-content/uploads/FDA-Sign-On-Letter-reduced-size.pdf (Mar. 20, 2025).

[35] Joshua J. Neumiller et al., *Compounded GLP-1 and Dual GIP/GLP-1 Receptor Agonists: A Statement from the American Diabetes Association*, 48 DIABETES CARE 177—181 (Feb. 2025), https://diabetesjournals.org/care/article/48/2/177/157478/Compounded-GLP-1-and-Dual-GIP-GLP-1-Receptor.

[36] Health Canada, *Health Product Recall: Semaglutide + Pyridoxine: produced with an unauthorized active pharmaceutical ingredient* (last updated Jan. 21, 2025), https://recalls-rappels.canada.ca/en/alert-recall/semaglutide-pyridoxine-produced-unauthorized-active-pharmaceutical-ingredient.

[37] South African Health Products Regulatory Authority, *Communication to Stakeholders: INTENTION TO DECLARE MEDICINES COMPOUNDED IN TERMS OF SECTION 14(4) CONTAINING GLP-1 OR GLP-1/GIP AGONISTS UNDESIRABLE IN TERMS OF SECTION 23 OF THE MEDICINES AND RELATED SUBSTANCES ACT, ACT 101 OF 1965, AS AMENDED* (Mar. 5, 2025), https://www.sahpra.org.za/wp-content/uploads/2025/03/Comms-to-Industry-RC03-Intention-to-Declare-Medicines-Compounded.pdf.

medicine "undesirable" if it is not in the public interest that such medicine is made available to the public.[38] SAHPRA concluded that compounded products using GLP-1 agonist active ingredients are not in the public interest because of the inherent variability, lack of regulatory oversight, and potential safety risks associated with such practices.[39]

75.     Furthermore, the Brazilian Health Regulatory Agency ("ANVISA") concluded that the safety and efficacy profile of the synthetic semaglutide being used in compounding may be different from semaglutide manufactured using recombinant DNA technology and that these differences could result in impurities with a higher degree of toxicity, which could decrease the safety of the final product.[40] ANVISA has also stated that, regardless of its source, semaglutide presents technical challenges that compounding pharmacies are often not equipped to overcome.[41]

76.     The Australian government took the largest step to protect patients and banned compounding pharmacies in Australia from making GLP-1s like semaglutide based on safety concerns.[42]

---

[38] *Id.*

[39] *Id.*

[40] *See* Agencia Nacional de Vigilancia Sanitaria (ANVISA), Nota Técnica No. 74/2024/SEI/COINS/GGFIS/DIRE4/ANVISA (Sept. 18, 2024); ANVISA, Nota Técnica No. 92/2024/SEI/COINS/GIMED/GGFIS/DIRE4/ANVISA (Nov. 13, 2024).

[41] ANVISA, Nota Técnica No. 115/2025/SEI/GIMED/GGFIS/DIR4/ANVISA (Mar. 21, 2025).

[42] Therapeutic Goods Act 1990 (effective date Oct. 1, 2024), https://www.legislation.gov.au/F1996B00406/latest/text; Ministers Department of Health and Aged Care, *Protecting Australians from Unsafe Compounding of Replica Weight Loss Products* (May 22, 2024), https://www.health.gov.au/ministers/the-hon-mark-butler-mp/media/protecting-australians-from-unsafe-compounding-of-replica-weight-loss-products?language=en.

**G.    Government Warnings About False and Misleading Advertisements Regarding Compounded Semaglutide**

77.    Recently, in September 2025, FDA sent more than 50 warning letters to GLP-1 drug compounders and telehealth companies selling compounded weight loss products regarding false and misleading statements made in advertising.[43]

78.    In these letters, FDA warned that advertisements stating that compounded semaglutide products have the "same active ingredient" or "are the same medication" as Ozempic® and Wegovy®, are "clinically proven," or contain "clinically proven ingredients," are false or misleading because they "imply that your products are the same as an FDA-approved product when they are not."[44]

79.    FDA similarly warned companies selling compounded semaglutide products that describing their products as "clinically proven to work," or stating in their advertisements that their products are "Clinically Proven[ ] [because] Semaglutide is FDA-approved for chronic weight management…." and are "backed by extensive clinical research" are false or misleading for the same reason.[45]

80.    FDA further warned that advertisements claiming that compounded GLP-1 products are "customized," "custom," or "personalized" are also false and misleading when used to imply that compounded drugs are FDA-approved.[46]

---

[43] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss,* (last updated September 25, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fdas-concerns-unapproved-glp-1-drugs-used-weight-loss, (last visited Oct. 27, 2025); *see also* FDA, Warning Letters, (last updated Oct. 24, 2025), available at: https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters (last visited Oct. 27, 2025).

[44] *See* FDA, Warning Letters, (last updated Oct. 24, 2025) available at: https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/compliance-actions-and-activities/warning-letters (last visited Oct. 27, 2025).

[45] *Id.*

[46] *Id.*

81.     As discussed in detail in Section III further below, the statements made by Mochi in its advertising of its Unapproved Compounded Drugs are of the very same nature as the types of statements that FDA has warned are false and misleading.

**H.      Despite Government Warnings, Consumers Have Been and Continue to Be Deceived and Misled About Compounded Drugs**

82.     There has been extensive false and misleading promotion of compounded GLP-1 drugs, leading many consumers to be misled as to the safety and efficacy of these drugs, despite their lack of testing and FDA approval.

83.     In 2025, the National Consumers League ("NCL") conducted a survey of 1,498 women and found that many had incorrect beliefs about compounded GLP-1s.[47] For example, only five percent of women surveyed mentioned that compounded drugs are not FDA-approved while six percent believe compounded drugs are generic versions of branded drugs, which is false.[48]

84.     Seventy-one percent of women surveyed "hold the view that compounded GLP-1s must be tested and proven safe to be on the market," and more than 55 percent of women surveyed believe that compounded GLP-1s are as safe and effective as branded GLP-1s even though these compounded drugs are not approved by the FDA.[49] Of the nearly 1,500 women surveyed, 49 percent of women generally, and 54 percent of women with obesity, believed that compounded GLP-1s "have the same ingredients as the branded GLP-1 drugs," despite the reality that compounded drugs can be made with different ingredients or different concentrations of ingredients than the branded versions.[50]

85.     The survey also used a realistic fictional advertisement that looked at "the impact of aggressive direct-to-consumer advertising on television, social media, and online about compounded

---

[47] Nat'l Consumers League, *The Influence of Disinformation on Attitudes and Beliefs About Compounded GLP-1 Drugs: A Dose of Reality* at 4 (May 2025), https://nclnet.org/wp-content/uploads/2025/05/The-Influence-of-Disinformation-on-Attitudes-and-Beliefs-About-Compounded-GLP-1-Drugs-Survey-Results.pdf.

[48] *Id.* at 5.

[49] *Id.* at 6.

[50] *Id.*

GLP-1 products," finding that "even though women understand the purpose and limitations of compounded drugs generally, the deluge of misleading claims online has clouded their views about GLP-1 compounded products with concerning implications for health professionals," such as that 81 percent of the respondents "said they found the claims in the fictional ad credible and 40 percent who have not been treated for obesity in the past two years said they are likely to use a compounded GLP-1 after seeing the ad."[51]

86.    Another survey published in 2025 assessed advertising practices of websites selling compounded GLP-1 RAs, including semaglutide, tirzepatide, and liraglutide, and found that "most websites did not disclose that compounded GLP-1 RAs were not FDA approved, although some suggested these drugs were FDA approved."[52] The survey also found that many websites provided unauthorized efficacy claims, and some websites failed to disclose that the medications were compounded, or incorrectly referred to them as generic.[53]

87.    As discussed in Section III below, Mochi has sought to capitalize on and exploit this widespread consumer confusion through false and misleading advertisements that direct patients away from proven medications like Novo Nordisk's Ozempic®, Wegovy®, and Rybelsus®.

## I.    Safety Risks of Unapproved Compounded Drugs

88.    The danger of compounded semaglutide is not merely theoretical, as the manufacture and distribution of improperly formulated compounded drugs have endangered and harmed public health. There is a long history of illnesses and deaths associated with erroneously compounded drugs distributed to patients, including in California.[54]

---

[51] *Id.* at 6-7.

[52] JAMA Network, *Online Advertising of Compounded Glucagon-Like Peptide-1 Receptor Agonists* (Jan. 17, 2025), https://jamanetwork.com/journals/jama-healthforum/ fullarticle/2829225.

[53] *Id.*

[54] Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated with Compounded or Repackaged Medications 2001-19* (Mar. 2, 2020), https://www.pew.org/en/research-and-analysis/data-visualizations/2020/us-illnesses-and-deaths-associated-with-compounded-or-repackaged-medications-2001-19.

89.    One of the most significant outbreaks was the New England Compounding Center crisis. In 2012, nearly 800 patients in 20 states were diagnosed with a fungal meningitis infection after receiving injections of an unapproved preservative-free methylprednisolone acetate drug manufactured in Massachusetts.[55] At least one hundred people died as a result of the outbreak.[56] As FDA has stated, the outbreak "was the most serious in a long history of serious adverse events associated with contaminated, super-potent, mislabeled, or otherwise poor quality compounded drugs," and "many serious adverse events linked to poor quality compounded drugs, including outbreaks of infections and deaths have occurred since then."[57]

90.    Additionally, there have been notable public health incidents involving compounded drugs affecting California patients or originating from California compounding pharmacies. One significant example occurred in 2017, where a compounding pharmacy in Irvine compounded curcumin (a component of the spice turmeric) emulsion products for injection that contained polyethylene glycol ("PEG") 40 castor oil, which is typically used industrially or for research but is not suitable to treat humans.[58] One patient who received this product suffered from a heart attack, lost oxygen to the brain, and died.[59] In 2014, a California clinic injected a patient with an unknown compounded mixture to treat chronic musculoskeletal pain; the patient later learned that she had contracted Hepatitis C virus when

---

[55] DOJ, *Two Former New England Compounding Center Pharmacist Sentenced* (May 30, 2019), https://www.justice.gov/usao-ma/pr/two-former-new-england-compounding-center-pharmacists-sentenced.

[56] *Id.*

[57] FDA, *FDA's Human Drug Compounding Progress Report* (Jan. 2017), https://www.fda.gov/media/102493/download.

[58] *See* FDA, *FDA investigates two serious adverse events associated with ImprimisRx's compounded curcumin emulsion product for injection* (Aug. 4, 2017),

https://www.fda.gov/drugs/human-drug-compounding/fda-investigates-two-serious-adverse-events-associated-imprimisrxs-compounded-curcumin-emulsion; Janet Woodcock and Julie Dohm, *Toward Better-Quality Compounded Drugs — An Update from the FDA*, 377 New England J. of Med. 2509 (Dec. 2017), https://www.nejm.org/doi/full/10.1056/NEJMp1712905.

[59] *Id.*

she attempted to donate blood.[60] A subsequent investigation by local public health agencies and the U.S. Centers for Disease Control and Prevention discovered that the patient and six others contracted Hepatitis C virus after receiving injections at the same California clinic. The investigation uncovered poor infection control practices at the clinic, including reentering a multidose vial with a used syringe, using a single-dose vial for multiple patients, poor hand hygiene, and inconsistent glove use.[61]

91.    Because of the risk inherent in compounded drugs, FDA has issued several other "compounding risk alerts to inform health care professionals and compounders about risks associated with compounded drugs, including information on adverse events, outbreaks and issues with product quality."[62] These alerts have warned about compounded drugs that did not contain the active ingredient listed on the label of the product[63] and the variability in dosages of the active ingredients in compounded drug products intended for oral and sublingual administration.[64] FDA has stated that these issues make it "challenging to predict which potential risks may be associated with these products," and place patients "at risk for serious adverse events, misuse, and abuse."[65]

92.    FDA and California regulatory authorities have also worked together to protect patients from quality issues related to compounded semaglutide products.

---

[60] Pew Charitable Trusts, *U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001-19*, (Mar. 2, 2020) https://www.pew.org/en/research-and-analysis/data-visualizations/2020/us-illnesses-and-deaths-associated-with-compounded-or-repackaged-medications-2001-19.

[61] *See* Monique A. Foster et al., *Notes from the Field: Investigation of Hepatitis C Virus Transmission Associated with Injection Therapy for Chronic Pain — California, 2015*, 65 CDC Morbidity and Mortality Weekly Report 547 (Jun. 2016).

[62] FDA, *Compounding Risk Alerts* (last updated Apr. 22, 2025), https://www.fda.gov/drugs/human-drug-compounding/compounding-risk-alerts.

[63] FDA, *FDA investigates two adverse events associated with United Pharmacy's compounded glutamine, arginine, and carnitine product for injection* (last updated June 21, 2018), https://www.fda.gov/drugs/human-drug-compounding/fda-investigates-two-adverse-events-associated-united-pharmacys-compounded-glutamine-arginine-and.

[64] FDA, *FDA warns patients and health care providers about potential risks associated with compounded ketamine products, including oral formulations, for the treatment of psychiatric disorders* (last updated Oct. 10, 2023), https://www.fda.gov/drugs/human-drug-compounding/fda-warns-patients-and-health-care-providers-about-potential-risks-associated-compounded-ketamine.

[65] *Id.*

93.    On April 6, 2022, the California Board of Pharmacy notified the public that an out-of-state compounding pharmacy was expanding its recall of products due to a lack of assurance of sterility.[66] This recall included batches of compounded semaglutide products. The compounding pharmacy ultimately recalled over 15,000 vials of compounded semaglutide across the country.[67]

94.    On August 14, 2024, FDA received a complaint from a patient who noticed a black particulate in a vial of semaglutide compounded by a pharmacy in Ontario, California.[68] FDA and California regulatory authorities inspected the facility a month later and discovered conditions that could cause the compounded drugs to become contaminated.[69]

**J.    Adverse Events Reported After Taking Compounded Semaglutide Drugs**

95.    FDA has reported that it has "received multiple reports of adverse events, some requiring hospitalization, that may be related to" compounded drugs purporting to contain semaglutide and has reminded patients and health care professionals that the "agency does not review compounded versions of these drugs for safety, effectiveness, or quality."[70]

96.    According to FDA's Adverse Event Reporting System, as of March 31, 2025, there had been 767 cases of adverse events associated with compounded products that purport to contain semaglutide.[71] This figure is triple the number of adverse events for *all* compounded drugs in fiscal year

---

[66] California Board of Pharmacy, Recall Alert: Tailor Made Compounding (Apr. 4, 2022), https://www.pharmacy.ca.gov/about/recall_alerts/040622_taylor.pdf.

[67] *See* FDA Enforcement Report, Event ID 89909 (2022), https://www.accessdata.fda.gov/scripts/ires/index.cfm?Event=89909.

[68] *See* FDA, *FDA warns patients and health care professionals not to use compounded drugs from Fullerton Wellness*, (last updated Nov. 1, 2024) https://www.fda.gov/drugs/drug-safety-and-availability/fda-warns-patients-and-health-care-professionals-not-use-compounded-drugs-fullerton-wellness, (last visited Oct. 27, 2025).

[69] *Id.*

[70] FDA, *Medications Containing Semaglutide Marketed for Type 2 Diabetes or Weight Loss* (last updated Sept. 25, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss, (last visited Oct. 27, 2025).

71 FDA, FAERS Public Dashboard, https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (search for all drug products including "semaglutide" and filter by "Compounded Drug" tag).

2022.[72] FDA has classified approximately 75 percent of those cases as "serious" adverse events; approximately 25 percent of those cases have resulted in hospitalization; and 14 of those cases involved patient deaths.[73]

97.    Such adverse events are likely underreported.[74] These adverse events are underreported because unlike manufacturers of FDA-approved medicines, federal law does not require state-licensed pharmacies to report adverse events to FDA[75] and outsourcing facilities report only adverse events that they classify as serious and unexpected.[76]

## K.    Governing State and Federal Law

### 1.    The Lanham Act

98.    The Lanham Act protects consumers and competitors from deception and unfair competition in the marketplace. It does so in part by prohibiting false and misleading statements of fact in commercial advertising and promotion. Statements that misrepresent the nature, characteristics, or qualities of a business's goods, services, or commercial activities are actionable under Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B).

---

[72] FDA, *Mitigating Risks of Compounded Drugs Through Surveillance* (last updated Sept. 20, 2023), https://www.fda.gov/drugs/human-drug-compounding/mitigating-risks-compounded-drugs-through-surveillance, (last visited Oct. 27, 2025).

[73] FDA, FAERS Public Dashboard, https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis (search for all drug products including "semaglutide" and filter by "Compounded Drug" tag).

[74] FDA, *FDA's Concerns with Unapproved GLP-1 Drugs Used for Weight Loss* (last updated September. 25, 2025), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/medications-containing-semaglutide-marketed-type-2-diabetes-or-weight-loss, (last visited Oct. 27, 2025).

[75] *Id.*

[76] *See* FDA, *Guidance for Industry: Adverse Event Reporting for Outsourcing Facilities Under Section 503B of the Federal Food, Drug, and Cosmetic Act* (Oct. 2015), https://www.fda.gov/media/90997/download.

### 2.    California False Advertising Law

99.    California's False Advertising Law makes it unlawful for any person or entity to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

### 3.    California Unfair Competition Law

100.    California's Unfair Competition Law prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

101.    The "unlawful" prong of California's Unfair Competition Law establishes a cause of action for unfair competition based on violations of other state laws.

102.    The "fraudulent" prong of California's Unfair Competition Law establishes a cause of action for false or misleading statements of fact in commercial advertising or promotion.

### 4.    California Law Governing Corporate Practice of Medicine

103.    California, like a majority of states, prohibits corporations from practicing medicine[77]—a legal bar known as the corporate practice of medicine doctrine.

104.    This longstanding doctrine bans corporations not only from directly practicing medicine, as its name implies, but also from employing physicians to provide professional medical services or controlling or influencing the practice of medicine.

105.    The public policy concerns animating the corporate practice of medicine doctrine are stark: there exists a clear tension between a corporation's obligation to its shareholders to maximize profits and a physician's duty to provide quality care to patients. This tension, if not mitigated with appropriate controls, would inevitably compromise a physician's independent medical judgment, risking harm to patient health.

106.    Under California's corporate practice of medicine doctrine, "a corporation may not engage in the practice of medicine, either directly or indirectly, by contracting with physicians or other

---

[77] *See* Cal. Bus. & Prof. Code §§ 2052 (criminalizing the practice of medicine without a license), 2032 (permitting only natural persons to be licensed to practice medicine in California), 2400 (providing that "[c]orporations and other artificial entities . . . have no professional rights, privileges, or powers" in the practice of medicine in California).

health care professionals to provide health care services."[78] At its core, this law is intended to prevent unlicensed persons from interfering with, or influencing, the physician's professional judgment."[79]

107.    The Medical Board of California ("Board") has made clear that violation of the state's corporate practice of medicine law does not necessarily depend on existence of a formal employment relationship, noting that a corporation may engage in unlawful corporate practice of medicine "even if physicians operate as independent contractors and not as employees of [the] corporation."[80]

108.    Rather, the relevant inquiry turns on the extent of influence exerted by a corporation over physicians. As the Board has explained, a corporation violates California law "when it exercises control over decisions made by" physicians.[81]

109.    The Board has outlined the kinds of decisions that must remain strictly within the purview of licensed physicians:

- Identifying diagnostic tests appropriate for a condition;
- Determining the need for referrals to or consultation with another physician;
- Taking responsibility for the ultimate overall care of the patient (*including treatment options*); and

110.    Deciding the number of patients a physician sees in a given period of time or how many hours a physician works.[82]

111.    Corporations engaging in any such activities run afoul of California's prohibition on the corporate practice of medicine.

---

[78] Medical Board of California, Enforcement Actions Re Unlicensed Practice of Medicine (May 5, 2011) ("MBC CPOM Enforcement Guidance").

[79] *See* Medical Board of California, Information Pertaining to the Practice of Medicine: Corporate Practice of Medicine, https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/ ("MBC CPOM Guidance").

[80] MBC CPOM Enforcement Guidance.

[81] MBC CPOM Enforcement Guidance.

[82] *See* MBC CPOM Guidance (emphasis added).

112.    California corporate practice of medicine law "encompass[es] not only direct medical decisions, but 'business' and 'administrative' decisions which have medical implications as well."[83] To this end, the Board has stated that "business" or "management" decisions and activities that amount to control over a physician's practice of medicine and that, if exercised by a corporation, would raise "red flags" indicating the corporate practice of medicine. These responsibilities include, *inter alia*, owning a patient's medical records and selecting, hiring, and firing physicians.[84]

113.    California law governing telehealth likewise makes clear that a corporation cannot be involved in clinical decisions regarding prescriptions—including a prescription drug's formulation, dosage, or titration schedule. Rather, such prescribing decisions must be made by a physician pursuant to a good faith assessment of the patient, which should identify the clinical need for the drug prescribed.[85]

114.    Due to California's corporate practice of medicine doctrine, telehealth companies owned and operated by non-physicians are prohibited from providing medical care to patients or employing physicians to provide such care.

115.    To comply with this restriction, telehealth companies often rely on an exception to the corporate practice of medicine granted by law to physicians—known as a "professional corporation" ("PC") or sometimes in other states, a "professional association" ("PA"). Subject to limited exceptions, non-physicians cannot own shares in or exercise control over a PC.[86] To protect physician autonomy, California prohibits shareholders of a PC from entering into a voting "arrangement vesting another

---

[83] MBC CPOM Enforcement Guidance.

[84] *See* MBC CPOM Guidance.

[85] *See* California Business & Professions Code § 2242(a) (providing that "[p]rescribing, dispensing, or furnishing dangerous drugs . . . without an appropriate prior examination and a medical indication" constitutes "unprofessional conduct"); § 4022(a) (defining "dangerous drug" as a prescription drug, i.e., "[a]ny drug that bears the legend: 'Caution: federal law prohibits dispensing without prescription,' 'Rx only,' or words of similar import").

[86] *See* Cal. Corp. Code §§ 13405(a) (permitting a PC to "lawfully render professional services in this state, but only through employees who are licensed persons"), 13406(a) ("[S]hares of capital stock in a professional corporation may be issued only to a licensed person or to a person who is licensed to render the same professional services in the jurisdiction or jurisdictions in which the person practices, and any shares issued in violation of this restriction shall be void.").

person (other than another person who is a shareholder of the same [PC]) with the authority to exercise the voting power of any or all of the shareholder's shares."[87]

116.     Although a corporate telehealth company may contract with one or more PCs—either directly or through a management services organization—this partnership cannot stray beyond limited administrative support. The Board has recognized that partnerships between corporations and PCs would violate California law to the extent that they involve a "non-physician exercising controls over a physician's medical practice, even where physicians own and operate the business," as opposed to the corporation "only providing administrative staff and services for a physician's medical practice."[88]

## II.     Mochi Violates California Law by Engaging in the Unlicensed Corporate Practice of Medicine

117.     Mochi violates California's prohibition on the corporate practice of medicine in multiple ways. First, Mochi Health's affiliated medical group is under the direct control and influence of non-physicians. Second, Mochi Health hires and employs physicians, controls physician prescribing guidelines, and controls patient medical records. Third, Mochi Health changes patient prescriptions *en masse* by changing the dosages and formulations of its Unapproved Compounded Drugs. Fourth, Mochi Health changes patient prescriptions without any consultation from a health care provider or any indication that such changes are medically necessary.

### A.     Mochi Health and Mochi Medical Are Controlled by Non-Physicians Who Influence Patient Care

118.     Mochi Health is a telehealth corporation that purports to match patients with physicians to provide them with medical services. One such service is weight loss and weight management. These same physicians prescribe Defendants' Unapproved Compounded Drugs.

---

[87] Cal. Corp. Code § 13406(a).

[88] *See* MBC CPOM Guidance.

119.    Myra Ahmad is Mochi Health's Co-Founder and Chief Executive Officer. Upon information and belief, Ms. Ahmad is married to Abraham Chaibi,[89] who is also an owner of Mochi Health.

120.    Ms. Ahmad publicly characterizes herself as a physician.[90] She has done so in interviews, including one video interview on an online channel with more than 23,000 subscribers.[91] In the same video interview, Ms. Ahmad does not correct the interviewer when the interviewer addresses her as "Dr. Myra."[92]

121.    In truth, Ms. Ahmad is not a licensed physician in any state, including California. The same is true of her husband, Mr. Chaibi. By falsely claiming that she is a doctor, Ms. Ahmad has violated Cal. Bus. & Prof. Code §§ 2052 and 2054.[93]

122.    Their lack of proper licensure has not stopped Ms. Ahmad and Mr. Chaibi from directly and indirectly controlling and exerting undue influence on prescribing decisions for Mochi Health patients.

---

[89] Khaos Entertainment, *Myra Ahmad & Abrahim Chaibi Married December 21, 2019 at The Banff Springs Hotel. A magical multicultural wedding after a massive snowfall!!*, FACEBOOK (Dec. 22, 2019) https://www.facebook.com/watch/?v=668895403645110.

[90] DOWNSIZED, *Exclusive Interview Dr Myra – The CEO & Founder of Mochi Health Speaks Out!*, YOUTUBE (Feb. 28, 2025) https://youtu.be/XknghozB0mc?si=42iJvkHo8bRAu09Z&t=56.

[91] *Id.*

[92] *Id.*

[93] Cal. Bus. & Prof. Code §§ 2052 and 2054 ("any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense"); ("Any person who uses in any sign, business card, or letterhead, or, in an advertisement, the words 'doctor' or 'physician,' the letters or prefix 'Dr.,' the initials 'M.D.,' or any other terms or letters indicating or implying that he or she is a physician and surgeon, physician, surgeon, or practitioner under the terms of this or any other law, or that he or she is entitled to practice hereunder, or who represents or holds himself or herself out as a physician and surgeon, physician, surgeon, or practitioner under the terms of this or any other law, without having at the time of so doing a valid, unrevoked, and unsuspended certificate as a physician and surgeon under this chapter, is guilty of a misdemeanor."). Upon information and belief, Ms. Ahmad does not fall within any applicable exceptions to this section.

123.    Indeed, through Mochi Health, Ms. Ahmad and Mr. Chaibi exert undue control and influence over each of the Defendants and affiliated entities, with at least one of three family members (Ms. Ahmad, Mr. Chaibi, and Rana Ahmad) listed in past or present corporate filings of each Defendant and affiliated entities as well.

124.    For example, Mochi Health's Washington state registration lists Ms. Ahmad and Mr. Chaibi as "governors" and Rana Ahmad as its registered agent.[94] Upon information and belief, Rana Ahmad is Ms. Ahmad's father.

125.    Upon information and belief, Mochi Health is funded by Dexterity Capital, an investment fund partially owned by Mr. Chaibi.[95]

126.    Rana Ahmad is the director of Mochi Medical, which represents Mochi Health's "affiliated medical services providers."[96] Mochi Medical, P.A.'s corporate registration forms have previously identified Ms. Ahmad as its Director and CEO, under penalty of perjury.[97] On the same registration form, Ms. Ahmad once again is falsely referred to as "Dr. Myra Ahmad."[98]

---

[94] Washington Sec'y of State, *Annual Report of Mochi Health Corp.* (2025).

[95] The Founder Story, *Myrah Ahmad, Co-Founder of Mochi Health Talks About Building A Telehealth Company,* SPOTIFY (July 27, 2022), https://open.spotify.com/episode/3q3PlAApJPmHTL8IOHQfk6 at 2:55; *see also Decential, 'Kind of free money' in the 2017 Crypto Mayhem Set Dexterity Capital on Path to High-Speed Trading* (Mar. 8, 2022), https://www.decential.io/articles/kind-of-free-money-in-the-2017-crypto-mayhem-set-dexterity-capital-on-path-to-high-speed-trading.

[96] Mochi Health, *Mochi - Terms of Use,* (Sep. 10, 2024), https://app.joinmochi.com/terms.

[97] Florida Sec'y of State, *Florida Profit Corporation Annual Report* (2023), https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p22000044605-2bfd1531-811d-42e0-b969-46b697f7426f&transactionId=p22000044605-7cedff0c-106d-4291-9946-53689adfd671&formatType=PDF.

[98] *Id.*

127. Mochi Health[99], Mochi Medical[100], P.A., and Mochi Medical CA, P.C.[101] all share an address at 161 Natoma Street, San Francisco, CA 94105.

128. Rana Ahmad has registered Mochi Medical, P.A. with his Mochi Health email address.[102]

129. Defendants work together to attract patients interested in Novo Nordisk's FDA-approved and efficacious medicines by advertising these drugs on Mochi Health's website and then overwhelmingly redirecting them towards Mochi Health's Unapproved Compounded Drugs. Defendants do so to line their pockets, all at the expense of patient safety.

**B.**   **Mochi Health Sells Its Unapproved Compounded Drugs Through Medical Groups Under Its Control**

130. Mochi Health makes no attempt to portray Mochi Medical's physicians as independent of Mochi Health's control; on Mochi Health's website, it proudly claims these physicians as "Our Mochi doctors."[103] Similarly, Mochi Health's website lists a number of physicians and refers to them as "[o]ur network of board-certified obesity medicine providers and registered dieticians."[104]

---

[99] Washington Sec'y of State, *Annual Report of Mochi Health Corp.* (2025).

[100] Florida Sec'y of State, *Florida Profit Corporation Annual Report* (2024), https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p22000044605-2bfd1531-811d-42e0-b969-46b697f7426f&transactionId=p22000044605-77e201fc-e0ba-4717-82b4-76960a0f22d8&formatType=PDF.

[101] California Sec'y of State, *Statement of Information for Mochi Medical CA, P.C.* (Filed Mar. 22, 2024).

[102] Vermont Sec'y of State, *Annual Report of Mochi Medical, P.A.* (2025).

[103] Mochi Health, *Medications*, https://joinmochi.com/medications (last visited Oct. 27, 2025).

[104] Mochi Health, https://joinmochi.com/ (last visited Oct. 27, 2025).



131.    Mochi Health—*not* Mochi Medical Groups or its affiliates—actively recruits physicians to be under its employ.[105] And Mochi Health is not recruiting *on behalf* of Mochi Medical, clearly stating in one solicitation that "Mochi Health is seeking experienced . . . providers who are passionate about obesity medicine . . . As a rapidly growing startup expanding across multiple states, *we* [as in, Mochi Health] provide a comprehensive, patient-centered approach to obesity care."[106]

132.    The following job posting is an example demonstrating that physicians are not hired to exercise their discretion as health care providers, but instead are hired to "[p]rescribe and manage GLP-1 medications and other obesity treatments."[107]

---

[105] Mochi Health Job Postings, *Physician – Obesity Medicine*, https://job-boards.greenhouse.io/mochihealth/jobs/4535832008 (last visited Oct. 27, 2025).

[106] *Id.*

[107] *Id.*

**mochi**
HEALTH

‹ Back to jobs

## Physician – Obesity Medicine



⊙ Remote

*Contract / Remote - United States*

**About The Role**

Mochi Health is seeking experienced, independent providers who are passionate about obesity medicine and building long-term relationships with patients. As a rapidly growing startup expanding across multiple states, we provide a comprehensive, patient-centered approach to obesity care. This role is ideal for physicians looking to practice evidence-based obesity medicine in a flexible, telemedicine-first environment.

**What You'll Do**

- Provide virtual consultations to patients managing obesity and metabolic health conditions.
- Prescribe and manage GLP-1 medications and other obesity treatments.
- Utilize our custom-built EMR designed for longitudinal obesity care.

133. These job postings are listed as openings at Mochi Health and *not* Mochi Medical. Mochi Health makes no attempt to distinguish between roles at Mochi Health and Mochi Medical on its "Careers" page, nor could it do so, since Mochi Health and Mochi Medical are one and the same.

134. Similarly, upon information and belief, Mochi Health provides its physicians with diagnostic tools and trains them to use these protocols. Mochi Health also owns and controls patient records through what it describes as its "custom-built" electronic medical record ("EMR") system, which, upon information and belief, requires certain records to be retained in the system.[108]

135. In the same job posting seeking physicians specializing in "Obesity Medicine," Mochi Health tells prospective physician candidates that "[b]y joining our team, you will . . . [u]tilize advanced tools like [Mochi Health's] custom-built EMR and obesity-specific protocols."[109]

---

[108] *Id.*

[109] *Id.*

136.    Mochi Health also improperly advertises and coordinates medical services, activities the Board exclusively reserves for licensed physicians. As mentioned above, Ms. Ahmad holds herself out as a "physician" when advertising Mochi Health's medical services. Likewise, on social media, Ms. Ahmad advertises Mochi Health's medical services and encourages individuals to sign up using referral codes, or digital vouchers.

### C.    Mochi Health's Control and Undue Influence over Patient Prescriptions

137.    Despite California's and other states' prohibitions on the corporate practice of medicine, Mochi Health unlawfully influences its physicians' practice of medicine and otherwise engages in unfair and unlawful practices regarding the practice of medicine by unlicensed persons and corporations.

138.    Mochi Health has and continues to violate California's and other states' prohibition on the practice of medicine by unlicensed individuals and corporations, and other California laws, by changing the dosing and formulation of its compounded semaglutide. The company has changed patient prescriptions *en masse*, tweaking the formula of its Unapproved Compounded Drugs and mixing them with unapproved and untested additives.

139.    For example, prior to December 2024, Mochi Health offered its knockoff semaglutide in dosages similar to those of Novo Nordisk's Wegovy® and Ozempic® medicines: 0.25 mg, 0.5. mg, 1 mg, 1.7 mg, 2 mg, and 2.4 mg.

140.    But as 2024 came to an end, Mochi Health unilaterally changed the dosages of its Unapproved Compounded Drugs to non-standard dosages, and it did so automatically and without any physician consultations.

141.    After December 2024, patients who had previously been prescribed 1 mg of Mochi Health's Unapproved Compounded Drugs were automatically transitioned to a new dose of 0.88 mg. Likewise, patients who had previously been prescribed 1.7 mg were now transitioned to 1.5 mg. The previous dosages that patients had come to rely on were no longer available.[110]

---

[110] JoinMochi-Info, *Compounded medication doses are changing with Mochi!*, REDDIT (Dec. 17, 2024), https://www.reddit.com/user/JoinMochi-Info/comments/1hgqy40/compounded_medication_doses_are_changing_with/.

mochi  **u/JoinMochi-Info** • 7 mo. ago
JoinMochi-Info

## Compounded medication doses are changing with Mochi!

### What Do I need to do?

There are *no extra steps* needed to stay on your treatment plan! We'll automatically readjust your refill to the closest appropriate dose, as in the image below.

### HOW will I know how many units to inject?

You will receive instructions with your prescription, just like you do now.

142.    Mochi Health's mass change was made without any advance warning to patients and without any physician input. Indeed, Mochi Health made clear that it was attempting to control prescriber decision making: the company said it was making this change to "ensure that patients *and their providers* have increased customization ability with [its] compounded medications."[111] Despite its attempts to disguise its language as a means to empower patients and prescribers, Mochi Health revealed that it—not Mochi Medical nor its physicians—controlled patient prescription guidelines.

143.    In the same announcement, Mochi Health also told patients that "[they] can always request a dose increase at any time" if they "don't like [their] new dose."[112] Making a prescription change was as easy as "selecting the next highest dose from the drop-down menu when [requesting a] refill."[113]

144.    One customer confirmed that their request for a new dosage was almost instantaneously approved: "I just upped my dose using the drop down option & it was immediately approved."[114] Upon information and belief, this change was approved without any good-faith physician consultation.

---

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *Id.*



145.    Similarly, Mochi Health has also manipulated the formulation of its Unapproved Compounded Drugs by including various additives that are not FDA-approved and have not been studied in a clinical setting. Mochi Health has made these changes without any determination of medical necessity.

146.    For example, one Reddit user complained that their compounded semaglutide had recently been mixed with vitamin B12. In response, another user explained Mochi Health's scheme: "Yes, it's become practically impossible [to be receive semaglutide without additives] due to the legal proceedings. The B12 added makes it different enough for compounding pharmacies to argue it's not the same medication as what Novo Nordisk is selling."[115]

---

[115] Zealousideal_Art_233, *Is it true what we can no longer get just straight Sema with no b12 mixed in?*, REDDIT (May 22, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1kt6o4s/is_it_true_that_we_can_no_longer_get_just/.



147.    Another patient ran into the same problem. "On the app it now's [sic] says that the refill dose [of compounded semaglutide] has b12 in it," the user said, "It seems like they are now adding to their compounding?"[116]

---

[116] Lucky-Sun-3648, *B-12 added to new refill doses*, REDDIT (Mar. 20, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jfz7kb/b12_added_to_new_refill_doses/.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23    148.    A different Reddit user replied to the post, explaining that their provider *explicitly told*

24  *them that Mochi Health was tweaking the formulations of its Unapproved Compounded Drugs to skirt*

25  *the law.* The user said, "My provider said due to everything going on they needed to 'tweak' the

26  medication and so it's not a copy of the brand name."[117]

27  _____

28  [117] *Id.*

149.     Alarmingly, none of these patients learned about these changes through their health care providers. Instead, they learned that the Unapproved Compounded Drugs that they were injecting into their bodies were being changed through Mochi Health's automated telehealth platform.

150.     In a separate post, Mochi Health opined on its use of vitamin B12 in its Unapproved Compounded Drugs. Mochi Health explained to a user that "whether your medication will have [B12] depends on if your state is supplied by [a] particular pharmacy" and *not* a medical indication, as required by law.[118]

151.     In the same post, Mochi Health offered the user medical advice and made medically dubious claims. The company told the user, "we can also reassure you that the addition of B12 is not detrimental to your health in any way. In fact, B12 is just an essential vitamin that's used by our bodies to create new blood cells and perform an array of other important biological processes."[119]



---

[118] JoinMochi-Info, *Do all mochi meds contain b12?*, REDDIT (Aug. 29, 2024),
https://www.reddit.com/r/JoinMochiHealth/comments/1f44iup/do_all_mochi_meds_contain_b12/.
[119] *Id.*

152.     In reality, ingesting B12 can have side effects and, in some cases, cause allergic reactions.[120] Mochi Health's own "Content Developer," Eva Shelton, acknowledged these potential risks in an online essay, explaining that "there is no solid evidence that vitamin B12 injections is [sic] effective in weight loss, and the potentially serious risks may outweigh the benefits."[121] Those risks can include "allergic reaction, heart problems, fluid build up in the lungs, electrolyte disturbances, diarrhea, swelling" and "increased risk of cancer."[122]

153.     Mochi Health made these changes for no other reason than to maximize its profits, at the expense of patients and in violation of the law. Mochi Health changed patient prescriptions *en masse* despite California's ban on the practice of medicine by unlicensed individuals and corporations, and even though California explicitly prohibits the prescription, dispensing, and furnishing of prescription drugs where there is no "medical indication" for doing so. *See* Cal. Bus. & Prof. Code § 2242.

154.     By changing patient dosages and formulations *en masse*, Mochi Health has placed the health of thousands of people at risk. Changes to patients' dosage schedules and formulations involve risks that are best discussed with their health care providers. Patients cannot understand and appreciate those risks when their prescriptions are unilaterally changed by a corporate entity that only has profit— and not their best interests—in mind.

### D.     Mochi Health Manipulates Patient Prescriptions Without Good Faith Examination or Medical Indication

155.     Mochi Health has not only violated California's prohibition on the unlicensed, corporate practice of medicine by changing patients' prescriptions *en masse*, but also by "[p]rescribing, dispensing, or furnishing dangerous drugs as defined in Section 4022 [*i.e.*, a prescription drug] without an appropriate prior examination and a medical indication, [which] constitutes unprofessional conduct." Bus. & Prof. Code § 2242. Under California law, physicians must comply with "the appropriate standard of care," which includes "a prior examination and a medical indication" that a prescription is warranted.

---

[120] Cronkleton, Emily, *Can Vitamin B12 Cause Side Effects?*, Healthline (last updated Feb. 24, 2025), https://www.healthline.com/health/food-nutrition/vitamin-b12-side-effects.

[121] Shelton, Eva, *Do weight loss shots and pills really work ?,* MEDIUM (Apr. 9, 2022), https://medium.com/@sheltoneva79/do-weight-loss-shots-and-pills-really-work-430e6563e418.

[122] *Id.*

156.    This standard of care cannot be met where company employees without medical licenses direct patient medical care and where the company manipulates prescriptions *en masse* for business purposes. As described above, that is the case here.

157.    At bottom, Mochi's unlawful behavior creates an unfair competitive advantage that puts patients at risk and harms Novo Nordisk. By unlawfully controlling scores of physicians that it pressures to prescribe its Unapproved Compounded Drugs, Mochi distorts the weight loss medication market: consumers lose out on the opportunity to use Novo Nordisk's medicines, because they will never be recommended those medicines by a Mochi physician.

III.    **Mochi Health Violates the Lanham Act and California Law by Engaging in False Advertising in Connection With Its Sale of Unapproved Compounded Drugs**

158.    Despite the foregoing, Mochi Health has made and continues to make false and misleading representations to patients regarding the nature of its Unapproved Compounded Drugs.

159.    Mochi Health's false and misleading statements can be separated into four categories: (1) false and misleading statements about the personalized nature of its Unapproved Compounded Drugs; (2) false and misleading statements about the quality and safety of its Unapproved Compounded Drugs vis-à-vis Novo Nordisk's FDA-approved medicines; (3) false and misleading statements about the quality, safety, and effectiveness of its Unapproved Compounded Drugs vis-à-vis studies analyzing Novo Nordisk's FDA-approved medicines; and (4) false and misleading statements about the quality and effectiveness of its Unapproved Compounded Drugs in comparison to Novo Nordisk's FDA-approved Drugs.

A.    **Mochi Health's False and Misleading Statements About the Personalized Nature of Its Unapproved Compounded Drugs**

160.    First, since Novo Nordisk's FDA-approved semaglutide-containing medicines were removed from the FDA shortage list and FDA restrictions therefore again applied to bar compounders from making what were essentially copies of Novo Nordisk's medicines, Mochi Health has claimed that its Unapproved Compounded Drugs are "custom-prepared to meet an individual patient's specific

needs."[123] (When Novo Nordisk's FDA-approved medicines were in shortage, Mochi Health referred to its Unapproved Compounded Drugs as "generic medications of some of our most effective medications for obesity."[124])

161.    But contrary to its advertising claims, Mochi Health did not actually begin "custom-preparing" its Unapproved Compounded Drugs to meet the specific needs of "individual patient[s]."  It simply changed its standard dose amounts to differ slightly from Novo Nordisk's available dosages and began including certain additives, such as vitamin B12, that are not rooted in any medical necessity. Mochi Health's Unapproved Compounded Drugs are still mass-produced and offered in a set, limited number of standard dosages.[125]

162.    Mochi Health's website is littered with misrepresentations about the customized nature of its Unapproved Compounded Drugs.[126] When consumers first land on Mochi Health's website, they are promised "[c]ustomized obesity medicine" from "doctors who care."[127]



Work with your hormones, *not against them.*

Customized obesity medicine with doctors who care.

**Am I eligible?**

---

[123] Mochi Health, *Treatments* (last visited Oct. 27, 2025), https://joinmochi.com/medications.

[124] Mochi Health, (Dec. 12, 2024),
https://web.archive.org/web/20241212140644/https://joinmochi.com/.

[125] Novo Nordisk does not raise this point to challenge Mochi Health's compliance (or lack thereof) with the FDCA, but rather to make clear that Mochi Health decided to change its advertising to exploit an FDA loophole.

[126] Mochi Health, (last visited Oct. 27, 2025), https://joinmochi.com/.

[127] *Id.*

163.    Mochi Health doubles down later on its main webpage: it promises consumers "[w]eight care designed *for you*," and tells them that they "deserve care that's as unique as [they] are."[128]

164.    Elsewhere, Mochi Health describes its compounded semaglutide as "custom-prepared to meet an individual patient's specific needs,"[129] and informs consumers that they will be prescribed Mochi Health's Unapproved Compounded Drugs after completing a short survey and their information is reviewed by a Mochi physician.[130]

165.    By repeatedly promising consumers that its compounded semaglutide is personalized to meet their specific needs, Mochi Health's advertising conveys the undeniable—but literally false—message to consumers that the medication inside each vial of its compounded semaglutide contains a unique combination of ingredients that is compounded specifically to each patient *after* an assessment of each consumer's particularized needs. Mochi Health's advertising claims clearly communicate that the medicine—and not the prescription process needed to obtain the medicine—is specifically designed for each patient.[131]

166.    In reality, Mochi Health's Unapproved Compounded Drugs are not personalized in any way. On information and belief, Mochi Health's customers receive one of two compounded semaglutide formulations, with either B12 or glycine added. And, as explained above, Mochi offers a series of preset dosages that are just outside the dosages of Novo Nordisk's FDA-approved medicines.[132] Neither Mochi Health nor its partner pharmacies compound each dose—or any dose, for that matter—to meet a customer's "specific needs"; instead, the doses are produced at scale in large batches before they are

---

[128] *Id.*

[129] Mochi Health, *Treatments*, (last visited Oct. 27, 2025), https://joinmochi.com/medications.

[130] Mochi Health, (last visited Oct. 27, 2025), https://joinmochi.com/ (telling patients to "[t]ake a short quiz to find out instantly if [they are] pre-approved for the program" and "[s]chedule [their] first video visit with an obesity medicine provider" who will "build a custom treatment plan around [their] unique needs.").

[131] *See, e.g., Eli Lilly & Co. v. Adonis Health, Inc.*, No. 25-CV-03536, 2025 WL 2721684, at *8 (N.D. Cal. Sept. 24, 2025) (finding advertising statements promoting compounded drug as a "patient-specific" "tailored" or "individualized treatment" would be "understood by any linguistically competent person" to mean that advertiser "specifically creates individualized medication plans for each patient").

[132] *Supra* Section II.D.

sold to any consumer. In other words, each consumer gets one of a small number of already mass-produced products, and no customer has a medicine "made to order" for his or her unique individual needs or goals.

167.    Presumably, if Mochi Health delivered on its promises of producing personalized medicines, then its customers would at least be modestly aware of the medicine's characteristics and how it was designed specifically for them. But that is not the case. Many Mochi Health customers report that Mochi Health's Unapproved Compounded Drugs are routinely modified without their knowledge or consent. Likewise, these modifications occur without Mochi customers having previously made any requests to Mochi or their physicians asking to change their prescriptions because of a medical need.

168.    For example, one consumer did not know that their purportedly customized medication was modified to include an ingredient that caused them to experience an allergic reaction that would have been avoided had the patient had a meaningful engagement with their provider: "I am allergic to glycine. I got a huge welt after injection that lasted for days. It was painful. After second dose I stopped because it wasn't a fluke. I reported it to my provider and she said that Redrock [pharmacy] only uses that additive. I paused my medication until they can switch me to a different pharmacy."[133] Furthermore, based on their provider's response to them, the consumer's drug was modified *not* because of any clinical necessity to meet their individual needs, but rather, because of the preferences of the compounding pharmacy that produced the drugs.

169.    Shockingly, in response to a consumer concerned about whether all of Mochi Health's compounded semaglutide included additives such as B12, Mochi Health confirmed that any "customizations" of its Unapproved Compounded Drugs were actually made in an attempt to avoid patent infringement, and not for any medical purpose—let alone any medical purpose specific to any individual patient. "One of our partner pharmacies," the company explained, "includes extremely small quantities of B12 *for patent protection!* The amounts added are not clinically significant. Essentially,

---

[133] Hisdotr, *Compounded Sema with glycine efficacy?*, REDDIT (last visited Oct. 27, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1nb09ds/compounded_sema_with_glycine_efficacy/.

whether your medication will have it depends on if your state is supplied by this particular pharmacy."[134]



170. Mochi Health's advertisements promising customized medications are provably false and have misled patients away from FDA-approved medications like Novo Nordisk's Ozempic®, Wegovy®, and Rybelsus®.

**B.    Mochi Health's False and Misleading Statements About the Quality and Safety of Its Unapproved Compounded Drugs vis-à-vis Novo Nordisk's FDA-Approved Medicines**

171. Second, Mochi Health has falsely advertised and continues to falsely advertise its Unapproved Compounded Drugs by making statements that describe the Ozempic®, Wegovy®, and Rybelsus® medicines but that are false or misleading when in reference to its Unapproved Compounded Drugs.

172. Mochi Health has claimed or implied and continues to claim or imply that its Unapproved Compounded Drugs have been approved by FDA or have been reviewed by FDA for safety, effectiveness, and quality.

---

[134] JoinMochi-Info, *Do all mochi meds contain b12?*, REDDIT (last visited Oct. 27, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1f44iup/do_all_mochi_meds_contain_b12/.

173.    On its website, Mochi Health makes false and misleading representations regarding approval by FDA. It claims, among other things, that "[s]emaglutide is an FDA-approved compound that is used in the management of type 2 diabetes and obesity."[135]

# Semaglutide for Weight Loss

Wegovy®, Rybelsus, or Ozempic®? So many options to choose from! Scroll down and learn more about these semaglutide-using medications.

## What is Semaglutide?

Semaglutide is an FDA-approved compound that is used in the management of type 2 diabetes and obesity. Semaglutide is available in different formulations, including subcutaneous injection (Ozempic and Wegovy) and oral tablet (Rybelsus). Ozempic® and Rybelsus are FDA-approved for the management of type 2 diabetes and can be used off-label to treat obesity. Wegovy® is the only form of semaglutide that is FDA-approved to manage obesity. The other difference between Wegovy® and Ozempic® is the dose; however, they are functionally the same medication.

174.    Contrary to Mochi Health's representations, FDA has never approved a semaglutide peptide generally. Instead, FDA has approved three of Novo Nordisk's *complete medicines*, which *contain* semaglutide for the specific indications outlined in the preceding paragraphs. Federal courts have held that statements like Mochi Health's are literally false when analyzing Lanham Act claims.[136] And when a promotional claim is literally false, consumer confusion is presumed and need not be demonstrated.[137]

175.    Mochi Health's false representations mislead customers into believing, incorrectly, that the product with "semaglutide" it offers has been reviewed and approved by FDA for safety and

---

[135] Mochi Health, *Semaglutide for Weight Loss: Semaglutide Side Effects & Benefits* (last updated Mar. 17, 2025), https://joinmochi.com/blogs/semaglutide-for-weight-loss.

[136] *Allergan USA, Inc. v. Imprimis Pharms., Inc.*, No. 8:17-cv-01551-DOC-JDE, 2019 WL 4545960, at *13 (C.D. Cal. March 27, 2019) (holding that defendant's representations that it only used FDA-approved components was literally false because "FDA does not approve drug 'components' or 'ingredients.'").

[137] *Id.*

effectiveness and/or that its Unapproved Compounded Drugs contain semaglutide that has been approved by FDA.

176. Mochi Health's labels, advertising, and promotional materials are false and misleading, suggesting or stating an association with Plaintiffs' FDA-approved Ozempic® and Wegovy® medicines when no such association exists.

177. Specifically, Mochi Health's website includes both the Novo Nordisk Ozempic® and Wegovy® marks and an image of an authentic Ozempic® injector pen despite, upon information and belief, neither offering for sale nor prescribing Novo Nordisk's FDA-approved Ozempic® and Wegovy® medicines.[138]



178. There is no need for Mochi Health to use the Ozempic® and Wegovy® trademarks to advertise or promote its Unapproved Compounded Drugs purporting to contain "semaglutide," other than to trade on the reputation of Plaintiffs and to create confusion in the marketplace or mislead the public regarding the origin, identity, or source of Mochi Health's Unapproved Compounded Drugs.

---

[138] Mochi Health - Medications, (last visited Oct. 27, 2025) https://joinmochi.com/medications.

179.    Novo Nordisk is not directly or indirectly supplying semaglutide to Mochi Health or any compounding pharmacies from which it may be sourcing its Unapproved Compounded Drugs.

180.    FDA has not reviewed the "semaglutide" allegedly in Mochi Health's Unapproved Compounded Drugs for safety, effectiveness, or quality, or otherwise as equivalent in safety, effectiveness, or quality to, Novo Nordisk's medicines.

181.    Mochi Health has no basis to equate the "semaglutide" allegedly in its Unapproved Compounded Drugs with Novo Nordisk's FDA-approved medications containing semaglutide, and doing so amounts to false and misleading advertising in violation of the Lanham Act and California False Advertising Law and Unfair Competition Law.

C.    **Mochi Health's False and Misleading Statements About the Quality, Safety, and Efficacy of Its Unapproved Compounded Drugs vis-à-vis Studies Analyzing Novo Nordisk's FDA-Approved Medicines**

182.    Third, Mochi Health has falsely claimed or implied and continues to falsely claim or imply that its Unapproved Compounded Drugs have been subjected to clinical studies and trials, or have otherwise achieved therapeutic outcomes attributable to the Wegovy®, Ozempic®, and Rybelsus® medicines.

183.    On its website, Mochi Health in promotional materials refers to clinical trials that, on information and belief, did not involve the semaglutide product sold by Mochi Health: "Clinical trials have shown that semaglutide significantly reduces body weight in non-diabetic individuals."[139]

---

[139] Mochi Health, *Semaglutide Dosage for Weight Loss: Guide for Non-Diabetics* (last updated Dec. 19, 2024) https://joinmochi.com/blogs/semaglutide-for-weight-loss-in-non-diabetics-dosage.

**The Science Behind Semaglutide and Weight Loss**

Semaglutide works by mimicking a hormone called GLP-1 (glucagon-like peptide-1) that targets areas of the brain involved in regulating appetite and food intake. (4) When administered, semaglutide slows gastric emptying, making you feel fuller for longer. (5) It also regulates glucagon and insulin secretion in response to meals, which helps maintain balanced blood sugar levels. (4)

Clinical trials have shown that semaglutide significantly reduces body weight in non-diabetic individuals. (1,7). Participants who received semaglutide in the clinical trial "Once-Weekly Semaglutide in Adults with Overweight or Obesity" were able to lose 5% - 15% or more of their baseline body weight at week 68 compared to those who received a placebo. Semaglutide is one of the most effective weight loss medications available.

184. Mochi Health's website also, in promotional materials for its Unapproved Compounded Drugs, contain "sources" that redirect to the clinical studies and trials to which the Ozempic®, Wegovy®, and Rybelsus® *medicines*—not the *ingredient*, semaglutide—were subject.[140]

---

[140] *Id.*

**Sources**

1. Wilding, J. P. H., Batterham, R. L., Calanna, S., Davies, M., Van Gaal, L. F., Lingvay, I., McGowan, B. M., Rosenstock, J., Tran, M. T. D., Wadden, T. A., Wharton, S., Yokote, K., Zeuthen, N., Kushner, R. F., & STEP 1 Study Group (2021). Once-Weekly Semaglutide in Adults with Overweight or Obesity. *The New England journal of medicine*, *384*(11), 989–1002. https://www.nejm.org/doi/full/10.1056/NEJMoa2032183

2. Food and Drug Administration. Ozempic (semaglutide) injection prescribing information, revised 2020. https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/209637s003lbl.pdf

3. Lincoff, A. M., Brown-Frandsen, K., Colhoun, H. M., Deanfield, J., Emerson, S. S., Esbjerg, S., Hardt-Lindberg, S., Hovingh, G. K., Kahn, S. E., Kushner, R. F., Lingvay, I., Oral, T. K., Michelsen, M. M., Plutzky, J., Tornøe, C. W., Ryan, D. H., & SELECT Trial Investigators (2023). Semaglutide and Cardiovascular Outcomes in Obesity without Diabetes. *The New England journal of medicine*, *389*(24), 2221–2232. https://www.nejm.org/doi/full/10.1056/NEJMoa2307563

4. Blundell, J., Finlayson, G., Axelsen, M., Flint, A., Gibbons, C., Kvist, T., & Hjerpsted, J. B. (2017). Effects of once-weekly semaglutide on appetite, energy intake, control of eating, food preference and body weight in subjects with obesity. *Diabetes, obesity & metabolism*, *19*(9), 1242–1251. https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.12932

5. Chaudhry, A., Gabriel, B., Noor, J., Jawad, S., & Challa, S. R. (2024). Tendency of Semaglutide to Induce Gastroparesis: A Case Report. *Cureus*, *16*(1), e52564. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10874596/#:~:text=The%20exact%20mechanisr

6. Marathe, C. S., Rayner, C. K., Jones, K. L., & Horowitz, M. (2013). Relationships between gastric emptying, postprandial glycemia, and incretin hormones. *Diabetes care*, *36*(5), 1396–1405. https://diabetesjournals.org/care/article/36/5/1396/29534/Relationships-Between-Gastric-Emptying

7. Ryan, D.H., Lingvay, I., Deanfield, J. *et al.* Long-term weight loss effects of semaglutide in obesity without diabetes in the SELECT trial. *Nat Med* (2024). https://doi.org/10.1038/s41591-024-02996-7

185.    On information and belief, Mochi Health has not conducted any placebo-controlled or clinical studies on its Unapproved Compounded Drugs or on semaglutide and is instead misleadingly referring to studies of Novo Nordisk's FDA-approved medicines to promote its Unapproved Compounded Drugs.

186.    Mochi Health's claim that "semaglutide" has been proven through clinical trials to have certain results is literally false. Novo Nordisk is unaware of any clinical trial of the semaglutide ingredient and is aware only of clinical trials of its FDA-approved semaglutide-containing medicines, Ozempic®, Wegovy®, and Rybelsus®.  In addition, Mochi Health's reference to clinical trials conducted

1
2
3

on Novo Nordisk's branded medications in promotional materials for its Unapproved Compounded

Drugs reinforces the false and misleading implication that Mochi Health's Unapproved Compounded

Drugs were the subject of clinical testing when they were not.

4
5

> **D.** **Mochi Health's False and Misleading Statements About the Quality and Effectiveness of its Unapproved Compounded Drugs in Comparison to Novo Nordisk's FDA-Approved Drugs**

6
7
8
9
10
11
12

187.    Fourth, Mochi Health makes little to no attempt to distinguish between its Unapproved

Compounded Drugs and Novo Nordisk's FDA-approved medicines on its website, instead claiming that

Novo Nordisk's FDA-approved medicines are simply "brand-name"[141] versions of the "FDA-approved

compound"[142] semaglutide. To the extent that Mochi Health does explain the differences between the

two products, it says that its Unapproved Compounded Drugs "fill an important gap as they are often

more affordable and accessible. Ozempic and Wegovy are often in shortage, making it difficult for

patients to stay on their treatment plan."[143]

13
14
15

188.    As stated above, Novo Nordisk's FDA-approved medicines have been studied, clinically

tested, and found to be safe for human use by federal regulators, while Mochi Health's Unapproved

Compounded Drugs have not.

16
17
18
19
20
21

189.    But consumers would not know this crucial fact by looking at Mochi Health's false and

misleading statements. Instead, consumers reviewing Mochi Health's statements likely would conclude

that Mochi Health's Unapproved Compounded Drugs and Novo Nordisk's FDA-approved medicines are

the same in all material respects—that they are both safe and effective, of similar quality, and made of

the same, or largely the same, materials—including the purportedly "FDA-approved compound"

22
23
24

[141] Mochi Health, *Tirzepatide vs Semaglutide: Cost, Side Effects, & Dosage,* https://joinmochi.com/blogs/tirzepatide-vs-semaglutide?utm_source=reddit&utm_medium=social&utm_campaign=reddit_post (last visited Oct. 27, 2025).

25
26

[142] Mochi Health, *Semaglutide for Weight Loss: Semaglutide Side Effects & Benefits*, https://joinmochi.com/blogs/semaglutide-for-weight-loss (last visited Oct. 27, 2025).

27
28

[143] Mochi Health, *Tirzepatide vs Semaglutide: Cost, Side Effects, & Dosage,* https://joinmochi.com/blogs/tirzepatide-vs-semaglutide?utm_source=reddit&utm_medium=social&utm_campaign=reddit_post (last visited Oct. 27, 2025).

semaglutide (which, again, is literally false, since FDA does not approve drug components or ingredients). The only difference the consumer would glean from Mochi Health's false and misleading statements—the one that Mochi Health repeatedly harps on—is that Mochi Health's Unapproved Compounded Drugs cost less.[144]

190.    The purpose of Mochi Health's attempts to associate its Unapproved Compounded Drugs with Novo Nordisk's FDA-approved medicines is clear: Mochi Health knows that if consumers believe its products are as safe and effective as Novo Nordisk's, but cost less, they are more likely to purchase Mochi Health's Unapproved Compounded Drugs. Sadly, because of Mochi Health's misrepresentations, patients who mistakenly believe it to be offering Novo Nordisk's FDA-approved medicines, or equivalent thereto, are unlikely to understand that Mochi Health's Unapproved Compounded Drugs carry unique risks and that Mochi Health's claims regarding their safety and effectiveness are not supported by any clinical trials or testing.[145]

191.    The sum of Mochi Health's false and misleading advertising campaign has been widespread consumer confusion between Mochi Health's Unapproved Compounded Drugs and Novo Nordisk's medicines and their safety, quality, and efficacy.

---

[144] Federal courts have held that statements about a compounded product's safety and efficacy are likely to impact consumer purchasing decisions. *See NN v. Rapid Weight Loss*, No. 4:25-cv-00446-JD, Order at *5–6 (D.S.C. June 13, 2025) ("Consumers choosing between a compounded product and an FDA-approved medication are likely to rely on [claims relating "directly to the therapeutic equivalence and efficacy" of the products] in making purchasing decisions.").

[145] *See, e.g.*, Dozens Say They Lost Eyesight After Routine Surgery Using Compounded Pharmacy Drugs, WFAA, https://www.wfaa.com/article/news/do-not-publish-yet/287-5f002ed3-e110-4063-9959-a2e5f54b5097 (reporting mistaken belief of patient taking a compounded drug that "every pill you take, every shot you take is tested"); FDA Alerts Health Care Providers, Compounders and Patients of Dosing Errors Associated with Compounded Injectable Semaglutide Products, https://www.fda.gov/drugs/human-drug-compounding/fda-alerts-health-care-providers-compounders-and-patients-dosing-errors-associated-compounded?utm_medium=email&utm_source=govdelivery ("Compounded drugs pose a higher risk to patients than FDA-approved drugs because compounded drugs do not undergo FDA premarket review for safety, quality or effectiveness.").

192.    For example, one consumer expressed both confusion and frustration after using Mochi Health's Unapproved Compounded Drugs; because of Mochi Health's misrepresentations, the consumer had come to believe that all semaglutide was the same no matter the source. [146] Despite using the exact same dosages of purportedly the same medication, the consumer found themselves "day dreaming about food" and "[a]ll the food noise came back" after taking Mochi Health's Unapproved Compounded Drugs.[147] The consumer could not understand why this was happening because they had "been on semaglutide for 4 months prior and there was none of this."[148]



193.    Other consumers were mystified after switching from Ozempic® and other Novo Nordisk medicines to Mochi Health's Unapproved Compounded Drugs because they were led to believe that they were getting the same product for less money.  For example, one consumer described "start[ing]

---

[146] Popular_Role_9174, *Has anyone else who previously used semaglutide seen the same dose not working with mochi?*, REDDIT (last visited Oct. 27, 2025),
https://www.reddit.com/r/JoinMochiHealth/comments/1erh2iz/has_anyone_else_who_previously_used_semiglutide/.

[147] *Id.*

[148] *Id.*

Ozempic in July 2024…[and] [a]lmost immediately lost 20 pounds and could physically feel a difference." But after the consumer switched to Mochi's Unapproved Compounded Drugs, they experienced "zero weight loss" despite taking the drugs for months.[149]

194.    Another consumer provided a similar story, explaining that they switched from Wegovy® to Mochi Health's Unapproved Compounded drugs because of the company's promises that the products were effectively the same but at different price points: "I originally was on Wegovy for four months and it worked great. I switched due to cost, and it seems like the compounded formula isn't as good, like it's not as strong and doesn't work as well…Has anyone had any similar experience?"[150]



---

[149] ImmediateSet9201, *Ozempic to Mochi update*, REDDIT (last visited Oct. 27, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jm3yb0/ozempic_to_mochi_update/.

[150] SoulPurpose1111, *Has anyone else been on the name brand meds and then switched to Mochi?*, REDDIT (last visited Oct. 27, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jntc81/has_anyone_else_been_on_the_name_brand_meds_and/.

195.    Many other consumers were similarly duped. One social media user complained that "I came from the highest dose of Wegovy & have been on semaglutide with mochi for 2 months now & I feel like it's not working as well as Wegovy" and that "[m]y weight has been stuck around the same & I feel like I'm hungrier again than I was on Wegovy."[151]

196.    Both users expressed their frustration because they had come to believe they were paying for the same products at a lower cost.[152] The first user told the second that he would prefer to pay a higher price for a Novo Nordisk medicine that "actually works."[153]

197.    Each of these complaints serve as examples of "[a] consumer[] seeking weight-loss medication containing" semaglutide who was "entice[d] away from" Ozempic® and Wegovy® towards Mochi Health's Unapproved Compounded Drugs by its false statements.[154]

198.    Mochi Health's advertising communicates the clearly false and misleading message that Mochi Health's Unapproved Compounded Drugs provide comparable results to Novo Nordisk's FDA-approved medications at a lower price point. By falsely comparing its Unapproved Compounded Drugs to Novo's FDA-approved and clinically tested medicines and communicating that Mochi Health's Unapproved Compounded Drugs provide the same or similar results for less cost to the patient, Mochi Health has caused a diversion of sales from Novo Nordisk, causing Novo to lose profits it otherwise would have realized on those sales, while also exposing the public to the unnecessary risks associated with untested compounded and unapproved drugs.

199.    On information and belief, unless enjoined by this Court, Mochi Health will continue to falsely advertise its products in violation of Plaintiffs' rights.

---

[151] PriYankee, *Has anyone else been on the name brand meds and then switched to Mochi?*, REDDIT (last visited Oct. 27, 2025), https://www.reddit.com/r/JoinMochiHealth/comments/1jntc81/has_anyone_else_been_on_the_name_brand_meds_and/.

[152] *Id*.

[153] *Id*.

[154] *Eli Lilly and Co., v. Adonis Health, Inc.*, Case No. 25-cv-03536 at *6 (N.D. Cal. Sept. 24, 2025).

200.   On information and belief, unless enjoined by this Court, Mochi Health's conduct will continue to cause mistake and deception.

## FIRST CAUSE OF ACTION

**(Defendants' False and Misleading Advertising and Promotion
in Violation of 15 U.S.C. § 1125(a)(1)(B)) (False Statements of FDA Approval, Generic
Equivalence, and Clinical Trial and Study) (Against Mochi Health Corp.)**

201.   Plaintiffs reallege and incorporate each allegation in the preceding paragraphs of this Complaint as though fully set forth here.

202.   Mochi Health Corp.'s practices, as described in this Complaint, constitute unfair competition and false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

203.   Mochi Health Corp. has violated the Lanham Act by using false or misleading descriptions of fact and false or misleading representations of fact in its commercial advertising or promotion that misrepresent the nature, characteristics, and qualities of Mochi Health Corp.'s business practices and products, as set forth above.

204.   Mochi Health Corp. has also engaged in other false or misleading advertising and promotion intended to assure patients that Mochi Health Corp.'s practices are lawful. On information and belief, Mochi Health Corp. provides patients who purchase Mochi Health Corp.'s Unapproved Compounded Drugs (or who Mochi Health Corp. is trying to persuade to purchase its drugs) information that makes false or misleading statements, including those described herein and in the exhibits hereto.

205.   The above-described acts of Mochi Health Corp., if not enjoined by this Court, are likely to deceive members of the general public.

206.   The above-described acts of Mochi Health Corp. have irreparably harmed and, if not enjoined, will continue to irreparably harm Plaintiffs.

207.   The above-described acts of Mochi Health Corp. have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from confusion, mistake, and deception.

208.   By reason of Mochi Health Corp.'s acts as alleged above, Plaintiffs have suffered and will continue to suffer injuries, including injury to Plaintiffs' business reputation.

209.    Because Plaintiffs' remedies at law are not adequate to compensate for all the injuries inflicted by Mochi Health Corp., Plaintiffs are entitled to entry of preliminary and permanent injunctive relief requiring Mochi Health Corp. to cease its false and misleading advertising and promotion and unfair competitive practices.

210.    Because the above-described acts of Mochi Health Corp. are willful, Plaintiffs are entitled to disgorgement of Mochi Health Corp.'s profits (enhanced at the Court's discretion), treble damages, and costs under 15 U.S.C. § 1117.

211.    This case is exceptional, making Plaintiffs eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## SECOND CAUSE OF ACTION

**(False Advertising in Violation of California False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*) (False Statements of FDA Approval, Generic Equivalence, and Clinical Trial and Study) (Against Mochi Health Corp.)**

212.    Plaintiffs reallege and incorporate by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

213.    California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq.*, prohibits false and misleading statements in connection with the sale of goods.

214.    Mochi Health Corp. violated this act by disseminating false and misleading statements about their Unapproved Compounded Drugs.

215.    Mochi Health Corp. knew or should have known these statements were false and misleading.

216.    Plaintiffs have suffered injury as a result of these violations because Mochi Health Corp.'s false and misleading advertising has diverted business from Plaintiffs, causing lost sales and profits, and has damaged its goodwill with former, existing, and potential customers.

217.    The Court should enter preliminary and permanent injunctive relief, in addition to awarding disgorgement of Mochi Health Corp.'s profits attributable to Mochi Health Corp.'s statements to Plaintiffs.

## THIRD CAUSE OF ACTION

**(Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.)**
**(Unlawful Corporate Control of Practice of Medicine and Prescription Practices)**
**(Against Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A.)**

218.    Novo Nordisk realleges and incorporates each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

219.    The violations of law described in this Complaint have been, and are being, carried out and directed wholly or in part within the County of San Francisco and other locations within the State of California where Mochi Health Corp. does business.

220.    California Business and Professions Code § 17200 prohibits "unlawful, unfair or fraudulent business practices."

221.    Mochi Health Corp. has violated California's Unfair Competition Law by engaging in the unlawful business practices that Mochi Health Corp. employs to promote and sell their Unapproved Compounded Drugs in violation of California law.

222.    Mochi Health Corp. has engaged and continues to engage in unlawful and unfair business acts or practices in violation of Section 17200. Such acts and practices include the following:

- Unlawfully engaging in and aiding and abetting the unlawful Corporate Practice of Medicine within the State of California in violation of Business & Professions Code §§ 2400, 2502 *et al.*

- Unlawfully prescribing medications without an appropriate prior examination by a physician and without the identification of a medical indication for the modification. *Id.*

- Unlawfully prescribing drugs without conducting a good-faith exam.

223.    The business practices that Mochi Health Corp. has employed to promote and sell Unapproved Compounded Drugs constitute "unlawful, unfair, or fraudulent" conduct under California's Unfair Competition Law. Such practices include permitting corporate interests to exert undue control over aspects of the physician-patient relationship, as described in Section II. The business practices further constitute "unlawful, unfair, or fraudulent" conduct under California's Unfair Competition Law by adding and modifying additives to drug products without examining the patient, and by prescribing oral and injectable drug products Defendants know are not personalized.

224.    Likewise, Mochi Medical CA, P.C. and Mochi Medical P.A ("Mochi Medical Groups") have aided and abetted Mochi Health Corp.'s unlawful corporate practice of medicine by following its directives as an unlicensed corporate entity in violation of California Business & Professions Code §§ 2400, 2502 *et al.*

225.    Mochi Health Corp.'s unfair and unlawful conduct (and Mochi Medical Groups' aid in perpetuating this unlawful conduct) is interfering with Novo Nordisk's ability to conduct its business. As a direct and proximate result of Mochi Health Corp.'s false and misleading campaign, Novo is suffering immediate and continuing, competitive, irreparable injury for which there is no adequate remedy at law.

226.    As a direct and proximate result of Mochi Health Corp.'s deceptive and unlawful practices, Mochi Health Corp. has obtained an unfair and illegal business advantage, thereby benefitting and profiting from sales it made as a result of goodwill associated with Novo Nordisk's semaglutide medicines. Novo Nordisk has suffered and will continue to suffer monetary damages that can be measured and quantified as well as discernible competitive injury by the loss of goodwill.

227.    Novo Nordisk is entitled to all remedies available under California's Unfair Competition Law, including injunctive relief, restitution, and attorneys' fees.

## FOURTH CAUSE OF ACTION

### Unfair Competition in Violation of the Common Law (Against Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A.)

228.    Plaintiffs reallege and incorporate each allegation in the preceding paragraphs of this Complaint as though fully set forth here.

229.    The above-described acts of Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A. constitute common law unfair competition.

230.    The above-described acts of Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A. unfairly and wrongfully exploit Plaintiffs' goodwill and reputation.

231.    The above-described acts of Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A. have irreparably harmed and, if not enjoined, will continue to irreparably harm the interest of the public in being free from confusion, mistake, and deception.

232.    Because Plaintiffs' remedies at law are not adequate to compensate for the injuries inflicted by Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A., Plaintiffs are entitled to entry of preliminary and permanent injunctive relief, in addition to monetary relief in the form of disgorgement of Defendants' profits and corrective advertising costs.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request judgment against Mochi as follows:

1.    That the Court enter a judgment against Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A. that they have:

      a.    Engaged in false and misleading advertising and promotion, in violation of 15 U.S.C. § 1125(a);

      b.    Engaged in unfair and deceptive trade practices under the common law of California and violated California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 *et seq*., and Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

2.    That each of the above acts was willful.

3.    That the Court preliminarily and permanently enjoin and restrain Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A. and their agents, servants, employees, successors, and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A., from:

      a.    using the Ozempic®, Wegovy®, and Rybelsus® marks, including (i) use in any manner likely to cause confusion or mistake, to deceive, or otherwise infringe Novo Nordisk's rights in the Ozempic®, Wegovy®, and Rybelsus® marks, or (ii) use in connection with the advertising, marketing, sale, or promotion of any Unapproved Compounded Drugs; and,

      b.    advertising, stating, or suggesting that any Unapproved Compounded Drugs, including any Unapproved Compounded Drugs that either are available, directly or indirectly, from or through Mochi or the use of which or access to which is facilitated by, or with the involvement of, Mochi:

         i.    are, or contain, genuine or authentic Novo Nordisk Ozempic®, Wegovy®, or Rybelsus® medicines;

        ii.    are sponsored by or associated with Novo Nordisk;

       iii.    are approved by or contain any ingredient approved by FDA; have been

reviewed by FDA for safety, effectiveness, or quality; or have been demonstrated to FDA to be safe or effective for their intended use;

    iv.    achieve or have been shown or proven to achieve therapeutic results, effects, or outcomes, including but not limited to by relying on or making reference to clinical trial results for Novo Nordisk's medicines;

    v.    achieve, have been shown or proven to achieve, or contain any ingredient that has been shown or proven to achieve therapeutic results, effects, or outcomes similar or identical to Novo Nordisk's medicines or are interchangeable with or equivalent to genuine Novo Nordisk medicines;

    vi.    are associated or connected in any way with Novo Nordisk or Novo Nordisk's medicines; or

    vii.    contain any ingredient (including semaglutide) that is supplied by Novo Nordisk, is approved by FDA, or is the same as any ingredient in any Novo Nordisk medicine.

    c.    engaging in unfair and deceptive trade practices with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines; and

    d.    engaging in deceptive acts or practices with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

4.    That the Court require Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A. to disclose conspicuously and prominently in any public-facing materials for any Unapproved Compounded Drugs, including all advertising, marketing, and promotional materials, that: (a) the Unapproved Compounded Drugs are compounded drugs that have not been approved by FDA and contain no ingredients that have been approved by FDA; have not been reviewed by FDA for safety, effectiveness, or quality; and have not been demonstrated to FDA to be safe or effective for their intended use; (b) the processes by which the compounded drugs are manufactured have not been reviewed by FDA; and (c) FDA-approved medicines containing semaglutide are available.

5.    That Plaintiffs be awarded monetary relief in the form of disgorgement of Mochi Health Corp.'s, Mochi Medical CA, P.C.'s, and Mochi Medical P.A.'s profits for their false advertising and

unfair and deceptive trade practices with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines and that this monetary relief be trebled due to their willfulness, in accordance with 15 U.S.C. § 1117 and any applicable state laws.

6.    That the Court award disgorgement to Plaintiffs of Mochi Health Corp.'s, Mochi Medical CA, P.C.'s, and Mochi Medical P.A.'s profits resulting from their unfair and deceptive trade practices with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

7.    That Mochi Health Corp., Mochi Medical CA, P.C., and Mochi Medical P.A. be ordered to account for and disgorge to Plaintiffs all amounts by which they have been unjustly enriched by reason of their unlawful actions with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

8.    That Plaintiffs be awarded punitive damages by reason of Mochi Health Corp.'s, Mochi Medical CA, P.C.'s, and Mochi Medical P.A.'s willful unlawful actions with respect to Novo Nordisk's Ozempic®, Wegovy®, or Rybelsus® medicines.

9.    For pre-judgment and post-judgment interest on all damages.

10.   That the Court award Plaintiffs their reasonable attorneys' fees pursuant to 15 U.S.C. § 1117 and any other applicable  provision of law.

11.   That the Court award Plaintiffs the costs of suit incurred herein.

12.   For such other or further relief as the Court may deem just and proper.

JURY DEMANDED

October 27, 2025                    Respectfully submitted,

By:  */s/ Nathan E. Shafroth*

Nathan E. Shafroth (Bar No. 232505)
nshafroth@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: +1 (415) 591-6091

Kevin B. Collins (admitted *pro hac vice*)
kcollins@cov.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jeffrey B. Elikan (admitted *pro hac vice*)
jelikan@cov.com
Chase Woods (admitted *pro hac vice*)
cwoods@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-5598

***Attorneys for Plaintiffs NOVO
NORDISK A/S and NOVO
NORDISK INC.***